**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| GEORGE SINK, P.A. INJURY LAWYERS, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>GEORGE SINK II LAW FIRM, LLC, )<br>GEORGE SINK LAW FIRM, LLC, )<br>SOUTHERN LEGAL ASSOCIATION, LLC, )<br>and GEORGE ("TED") SINK, JR., )<br>)<br>    Defendants. )<br>)  | **Civil Case No. 2:19-cv-01206-DCN** |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**
**<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................... 1

FACTUAL BACKGROUND.................................................................................... 3

LEGAL STANDARD............................................................................................... 11

ARGUMENT............................................................................................................ 11

I.     PLAINTIFF IS LIKELY TO SUCCEED ON
THE MERITS OF ITS CLAIMS................................................................... 11

      A.    Plaintiff Owns Valid and Protectable Trademark
Rights in the GEORGE SINK Marks.…………….............................. 12

      B.    Defendants' Use of the Designation GEORGE SINK or
GEORGE SINK II is Likely to Cause Consumer Confusion............... 14

           1.    There is a presumption of a likelihood of
confusion due to Defendants' intentional copying
of the GEORGE SINK Marks................................................. 14

           2.    Each of the relevant *Rosetta Stone* factors weighs
in favor of a finding of a likelihood of confusion.................. 15

                *i.*    *The GEORGE SINK Marks are strong*…………...……... 16
                *ii.*    *The parties' marks are nearly identical*………….…..……. 19
                *iii*    *The parties' services are identical*…………………..……. 20
                *iv.*    *The parties' facilities overlap*…………………....………. 21
                *v.*    *The parties' advertisements are similar*……....……….…….… 22
                *vi.*    *Defendants intend to capitalize on Plaintiff's
goodwill by inducing consumer confusion*………….…..……. 23
                *vii.*    *There has been actual confusion*…………………..……. 24
                 *viii.*    *The quality of Defendants' services*……....……….…..……. 24
                *ix.*    *The sophistication of the consuming public*……………..……. 24

II.    PLAINTIFF HAS AND WILL CONTINUE TO
SUFFER IRREPARABLE HARM.................................................................. 25

III.   THE BALANCE OF EQUITIES TIPS HEAVILY
IN PLAINTIFF'S FAVOR............................................................................. 26

IV.   THE PUBLIC INTEREST WEIGHS IN FAVOR
OF PLAINTIFF…………………................................................................... 28

CONCLUSION......................................................................................................... 28

Plaintiff George Sink, P.A. Injury Lawyers ("Sink, P.A." or "Plaintiff") submits the following memorandum in support of its Motion for Preliminary Injunction against Defendants George Sink II Law Firm, LLC ("Sink II"), George Sink Law Firm, LLC ("Sink III"), Southern Legal Association, LLC ("SLA"), and George ("Ted") Sink, Jr. ("Ted Sink") (collectively, "Defendants").

## INTRODUCTION

Plaintiff Sink, P.A. is a preeminent South Carolina-based law firm named after its founder, George T. Sink, Sr. ("Mr. George Sink"). Plaintiff has invested ██████ dollars and significant efforts in marketing and promoting its legal services under the mark GEORGE SINK, P.A. INJURY LAWYERS, and has been doing so extensively and continuously for more than two decades through television, radio, mail, phonebook, billboard, social media, and online advertising. Plaintiff's annual marketing expenditures were over $██████ last year, and during the past five years, have exceeded $██████. Through its extensive advertising, promotion, and overall success, Plaintiff is one of the most recognized names in the legal industry throughout South Carolina and Georgia as a personal injury law firm. Indeed, the general public associates the GEORGE SINK, P.A. INJURY LAWYERS mark with Plaintiff as a single source of legal services. This widespread consumer recognition—and Plaintiff's exclusive rights to use the mark GEORGE SINK, P.A. INJURY LAWYERS in connection with legal services—is further memorialized through Plaintiff's federal registrations for the marks GEORGE SINK, P.A. INJURY LAWYERS and GEORGE SINK, P.A. INJURY LAWYERS & Design (collectively, the "GEORGE SINK Marks"). There can be no reasonable dispute that Plaintiff has built a strong reputation for its legal services and has acquired substantial goodwill in the GEORGE SINK Marks.

1

In stark contrast, Defendants have no reputation or consumer recognition for legal services, and have no rights in the designations GEORGE SINK or GEORGE SINK II. Nor are Defendants affiliated with Plaintiff. Defendant Ted Sink was previously employed with Plaintiff, but no longer has any professional affiliation with Plaintiff since he was terminated. Yet, Defendants have opened a competing law firm under the names GEORGE SINK LAW FIRM and GEORGE SINK II LAW FIRM. Despite Defendants' knowledge of—or, more accurately here, because of—Plaintiff's longstanding reputation and widespread goodwill in the GEORGE SINK Marks, Defendants seek to offer legal services identical to Plaintiff's legal services, using the nearly identical law firm names GEORGE SINK LAW FIRM and GEORGE SINK II LAW FIRM, in overlapping geographic areas.

Contrary to statements released by Defendants' counsel to media outlets—such as "Whether trademark law permits a father to take back his son's name or restrict his right to practice law is an issue we look forward to litigating through the courts."—Plaintiff does not seek to enjoin Ted Sink from using his given name in his chosen profession. Plaintiff does seek, however, Court intervention to prohibit Defendants from using the designations GEORGE SINK and GEORGE SINK II in a manner that is likely to cause consumer confusion, including as the name of their competing law firm. There is "no absolute right" to use one's own name in his business, and the Lanham Act squarely prohibits such use "where doing so is likely to cause consumer confusion." *Ant v. McPartlin*, 2012 U.S. Dist. LEXIS 199796, at *14 (C.D. Cal. May 30, 2012). Indeed, as explained by the Fourth Circuit, "the Supreme Court … made clear that the right of an individual to use his name in connection with his trade must yield to the need to eliminate confusion from the marketplace." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990). This is particularly true where, as here, Defendants have no prior use or

reputation associated with the name it seeks to use, and "the only plausible motivation for [the] fight here is a wish to free-ride on [Plaintiff's] goodwill" and consumer recognition. *Basile, S.p.A. v. Basile*, 899 F.2d 35, 40 (D.C. Cir. 1990) (explaining that such use is "precisely what the law means to suppress").

A preliminary injunction is necessary here to protect the longstanding status quo, and to prevent actual and imminent irreparable harm to Plaintiff's goodwill and business while Plaintiff awaits adjudication of its claims. There is no evidence that Defendants can present to justify the clear infringing nature of their activities or diminish Plaintiff's overwhelming showing that it is likely to succeed on the merits of its claims. Equitable and public interest considerations likewise weigh in favor of a preliminary injunction. Accordingly, Plaintiff respectfully requests that the Court enjoin Defendants from using the designations GEORGE SINK or GEORGE SINK II, or any other GEORGE SINK-formative designation, to offer legal services in a manner that is likely to cause consumer confusion.

## FACTUAL BACKGROUND

### I.     Plaintiff's Reputation and Goodwill in the GEORGE SINK Marks

Plaintiff is a preeminent South Carolina-based law firm that focuses primarily on representing plaintiffs in personal injury, workers' compensation, social security disability, and veterans disability cases. (Declaration of George T. Sink, Sr. ("Sink Decl."), ¶ 4, attached hereto as Exhibit 1). Plaintiff was founded in 1997 by Mr. George Sink, and has since expanded from its first office in Charleston to 14 staffed offices throughout South Carolina and parts of Georgia. (*Id.* ¶¶ 2, 5). Plaintiff's use of the GEORGE SINK Marks in connection with its legal services has been exclusive and continuous since at least as early as 1997. (*Id.* ¶¶ 2-3, 15). There are no other businesses, law firms or otherwise, including entities registered with the

Secretary of State in South Carolina or Georgia that use "George Sink" in their business name. (*Id.* ¶ 14; Exhibits 3-4).

Plaintiff invests significant efforts and resources into the marketing and promotion of its legal services under the GEORGE SINK Marks, including through television, radio, billboards, mail, phonebooks, social media, and online advertising, as well as promotional events.  (Sink Decl. ¶ 3, 6-9).  Plaintiff currently airs on a daily basis nearly ███ television commercials and more than ██ radio commercials, in addition to the more than ███ billboards, throughout South Carolina and Georgia advertising its legal services.  (*Id.* ¶ 7).  Plaintiff also markets and promotes its legal services extensively online, including through its website, located at <sinklaw.com>.  (*Id.* ¶ 8).  Plaintiff uses the following additional domain names, each of which directs users to Plaintiff's website: <georgesinklaw.com>, <georgesink.com>, and <sinklawfirm.com>.  (*Id.*).  In addition to its website, Plaintiff further uses the Internet to market its services by maintaining business profiles and accounts with online media platforms such as Google Business, Facebook, LinkedIn, YouTube, and Twitter.  (*Id.*).

Plaintiff's marketing expenditures from 2006 to April 2019, which include, among other things, expenses for television advertising, ad placement, media production, radio advertising, internet advertising, internet media production, billboards, billboard placement and maintenance, mailers, phonebooks, promotional events and materials, campaigns, and marketing department salaries, total approximately $███████.  (*Id.* ¶ 9).  In 2019, from January through April alone, Plaintiff has invested over $██████ on marketing and promoting its legal services.  (*Id.*).  As a result of Plaintiff's extensive marketing, Plaintiff receives around ████ inquiries per month from potential clients seeking representation.  (*Id.* ¶ 10).  Plaintiff currently has approximately ████ active cases, and around 230 employees, including more than

4

45 lawyers.  (*Id.* ¶¶ 11-12).  Plaintiff's annual gross revenue further demonstrates Plaintiff's success as a law firm.  In 2018, Plaintiff's gross revenue was approximately $ ██████, and Plaintiff's forecasted gross revenue for 2019 is $ ██████.  (*Id.* ¶ 13).

Through decades of marketing and commercial success under the GEORGE SINK Marks, Plaintiff has a longstanding and established reputation as a premier law firm.  (*Id.* ¶ 23; Exhibits 5-11).  Pursuant to Plaintiff's reputation, Plaintiff receives significant amounts of unsolicited media attention.  For example, Plaintiff has repeatedly won awards for "Best Law Firm" in local publications, including The State Newspaper in 2014 and 2015, and the Charleston City Paper in 2018.  (Exhibit 5).  Plaintiff is described as "well-known" by various media outlets, and consistently receives mentions and recognition in the media.  (Exhibits 7, 11).  Even companies in completely different industries recognize Plaintiff as "[o]ne of the largest personal-injury law firms in the Southeast".  (Exhibit 6).

Plaintiff enjoys widespread recognition not only from the media, but also from the general public.  Indeed, the general public immediately recognizes and associates Plaintiff with its advertisements for legal services.  Illustrative of this widespread recognition is a story from February 2018 about a 4-year old boy named ██████ from South Carolina.  According to his mother, "██████ has been all about George Sink" after seeing one of Plaintiff's commercials.  (Exhibit 7).  Plaintiff's commercials feature its "all 9s" phone number, 999-9999, and ██████ wanted a "George Sink party with all 9s" for his birthday.  (*Id.*).  Plaintiff donated gifts and party favors, while Mr. George Sink made a surprise visit to ██████'s birthday party.  (*Id.*).  There are many similar examples showing the reach of Plaintiff's commercials.  For example, a radio host posted a photograph showing his odometer reaching 99999.9 miles, and titled the post "It Could Be, But No, This is NOT A George Sink Commercial."  (Exhibit 8).  As another

example, the following is a Twitter post made by an unknown third party, in which she "tags"

Plaintiff in the photograph of her dashboard displaying 99999 miles and 99 degrees (Exhibit 9):



@SinkLawFirm Check this out!

5:18 PM - 19 Sep 2018

More significantly, the general public also recognizes and associates the GEORGE

SINK Marks with Plaintiff as a single source of legal services in the area of personal injury.

There are a multitude of posts on the Internet that demonstrate this.  For example, an unknown

third party made a Facebook post on January 7, 2019, showing a photograph of his recent

automobile accident with the following caption regarding representation for his accident: "George Sink, Bill Green, or Joye Law Firm". (Exhibit 10).

In addition to Plaintiff's commercials, Plaintiff is known for its significant community involvement. For example, Plaintiff was recently a prime sponsor for Cinderella Day 2019, a donations drive aimed to provide high school students without the financial means with a prom outfit and accessories. (Exhibit 12). Plaintiff is a frequent supporter of and donor to non-profit organizations, such as the Charleston Animal Society. (*Id.*). Plaintiff's philanthropic efforts further propagate Plaintiff's reputation throughout the general public and build its goodwill in the GEORGE SINK Marks.

## II.    Plaintiff's Federal Service Mark Registrations

Plaintiff owns two federal registrations for its GEORGE SINK Marks. Plaintiff is the owner of U.S. Service Mark Registration No. 3,849,776 ("the '776 Registration") for the GEORGE SINK, P.A. INJURY LAWYERS & Design mark, which registration recites "legal services" in International Class 45, and was first used in commerce as early as February 18, 1999. The '776 Registration issued on September 10, 2010, from an application filed on January 10, 2010, and has been accorded incontestable status pursuant to 15 U.S.C. § 1065. (*See* DE 1-1). Plaintiff is also the owner of U.S. Service Mark Registration No. 4,620,500 ("the '500 Registration") for the GEORGE SINK, P.A. INJURY LAWYERS mark, which registration recites "legal services; legal services, namely, providing customized legal information, counseling, advice, and litigation services in all areas of law to people and families of modest incomes" in International Class 45, and was first used in commerce as early as February 18, 1999. The '500 Registration issued on October 14, 2014, from an application filed on March 3, 2014. (*See* DE 1-2).

## III.    Defendants' Unlawful Activities

Defendant Ted Sink's full name is George Theodore Sink, Jr.  (Sink Decl. ¶ 15).  Ted Sink is Mr. George Sink's son.  (*Id.*).  In March 2013, Ted Sink was hired to work in Plaintiff's marketing department.  (*Id.* ¶ 16).  Ted Sink started law school shortly thereafter in 2013, and graduated from Charleston School of Law in 2016.  (*Id.*).  Ted Sink was admitted to the South Carolina State Bar in November 2016, and the Georgia State Bar in June 2017.  (*Id.*; Exhibits 13-14).  During this time, and up until March of 2018, Ted Sink remained in Plaintiff's marketing department.  (Sink Decl. ¶¶ 16-17).  In March 2018, Ted Sink requested to be transitioned from Plaintiff's marketing department into an entry-level attorney position, and he first began practicing law that month making $██████████.  (*Id.* ¶ 17).  As an entry-level attorney with Plaintiff, Ted Sink's case load gradually grew to about half of a full attorney case load when, on February 7, 2019, he was terminated.  (*Id.*).  Ted Sink practiced law for less than a year total before his termination.  (*Id.*).  During his employment with Plaintiff, Ted Sink was paid $███████ or more in compensation.  (*Id.* ¶ 17).

Upon his termination, Ted Sink started taking steps to start his own law firm to compete with Plaintiff based solely on the perceived advantage he believed the name on his birth certificate provided.  (*Id.* ¶ 18; Declaration of Dr. Norman R. Wiedow, Jr. ("Wiedow Decl.") ¶¶ 7-8, attached hereto as Exhibit 22).  Indeed, on February 11, 2019, just a few days after his termination, Ted Sink formed SLA.  (Exhibit 15).  It appears that Ted Sink formed SLA as a shell entity for purposes of managing Sink II, which Ted Sink formed the next day on February 12, 2019, and lists SLA as the managing entity of Sink II.  (Exhibit 16).  Shortly thereafter, on February 27, 2019, Ted Sink formed Sink III.  (Exhibit 17).  Defendants are now promoting and marketing identical legal services in the area of personal injury, using the nearly identical

8

designations GEORGE SINK LAW FIRM and GEORGE SINK II LAW FIRM, in overlapping geographic areas.  (Sink Decl. ¶¶ 19-22, 24; Exhibits 18-19).  Indeed, Defendants have created a Facebook business profile page to market and advertise legal services for personal injury cases under the business name GEORGE SINK LAW FIRM.  (Exhibit 19).  Defendants have created, and have updated since the filing of the Complaint on April 25, 2019, a website to market legal services under the business name GEORGE SINK II LAW FIRM.  (Exhibit 18).  Ted Sink has also updated his profiles in the South Carolina and Georgia State Bar attorney directories to reflect GEORGE SINK LAW FIRM, Defendants' contact information, and the email address "georgesink@gmail.com".  (Exhibits 13-14).  Notably, only the website address field was not updated to reflect Defendants' information, and the website for Ted Sink in the South Carolina State Bar attorney directory lists Plaintiff's website <sinklaw.com>.  (Exhibit 13).

Defendants have made clear their intent to not only start a competing law firm, but to also use nearly identical GEORGE SINK-formative designations to market, promote, and advertise legal services, including in their business names, domain name, and email address. Given the overlap in business name, legal services offered, and geographic location, it is no surprise there have already been, in a span of a few months, issues resulting from confusion as to whether Plaintiff and Defendants are affiliated or even separate identities.  (Sink Decl. ¶¶ 19-22).  On or around March 7, 2019, Plaintiff received lien information related to a client claim from a vendor regarding a former client who chose to remain represented by Ted Sink when he was terminated and left Plaintiff.  (*Id*. ¶ 19).  Because the lien information was requested by Ted Sink from the email address georgesink@gmail.com, the vendor mistakenly sent the information to Plaintiff.  (*Id.*).  When Plaintiff explained that it was no longer representing the client, the vendor stated: "Are there two different law firms now for George Sink?  I am

confused." (*Id.* (emphasis added)). On April 18, 2019, Plaintiff's SEO specialist identified problems with the Google Business listing for Plaintiff's Charleston office as a result of Defendants' business listing for "George Sink Law Firm", which is also located in Charleston. (*Id.* ¶ 20). Plaintiff's SEO specialist explained that the "two locations were cannibalizing each other", and as a result, hurting Plaintiff's Google search rankings. (*Id.*). On May 10, 2019, Plaintiff received a call from bank attempting to verify a check issued by Defendants. (*Id.* ¶ 22). Banks routinely make such calls if they have concerns regarding the check, such as the accuracy of the amount, or the person attempting to cash or deposit the check. (*Id.*). Prior to Defendants use of the designations GEORGE SINK and GEORGE SINK II, Plaintiff has never received a check-verification call from a bank attempting to verify a check that was not issued by Plaintiff. (*Id.*).

Defendants further appear to be planning their next steps to increase their marketing of their legal services under the GEORGE SINK LAW FIRM and GEORGE SINK II LAW FIRM names. On or around April 26, 2019, Mr. Don Pratt, President of 16 Consulting Group and a television advertising service vendor for Plaintiff, reached out to Libby Spencer, the Greenville Sales Manager for WSPA, and asked if she could confirm whether Defendants were advertising on television in Greenville, South Carolina. (*Id.* ¶ 21). Ms. Spencer replied: "Yes, that is correct." (*Id.*). Defendants have also updated their website within the past 3 weeks with new information, and have made a new marketing post on their Facebook business page. (Exhibits 18-19). All signs indicate that Defendants are on the verge of commencing a significant increase in marketing activities to advertise their legal services under the infringing GEORGE SINK LAW FIRM and GEORGE SINK II LAW FIRM designations. Accordingly, Plaintiff

hereby seeks injunctive relief to prevent the actual and imminent irreparable harm described herein.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must show that (1) it is likely to succeed on the merits of its claim; (2) it is likely to suffer irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities tips in its favor; and (4) a preliminary injunction is in the public interest. *Nutramax Labs., Inc. v. Pure Supplements Ltd.*, 2017 U.S. Dist. LEXIS 98861, at *4 (D.S.C. June 27, 2017) (citing *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)) (granting preliminary injunction for trademark infringement).

## ARGUMENT

The purpose of a preliminary injunction is "to protect the status quo and to prevent irreparable harm during the pendency of the lawsuit," and it is precisely what is required here to protect Plaintiff's longstanding trademark rights in its business name. *United States v. South Carolina*, 840 F. Supp. 2d 898, 914 (D.S.C. 2011) (granting preliminary injunction). The evidence clearly establishes each of the four *Winter* factors for injunctive relief weighs in favor of Plaintiff, and Plaintiff respectfully submits that it is entitled to a preliminary injunction enjoining Defendants' infringing activities.

## I.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

In order to satisfy the first *Winter* factor, Plaintiff must demonstrate that it is "likely to succeed on the merits of at least one of the claims for which [it] seek[s] preliminary injunctive relief." *Synthes USA, LLC v. Davis*, 2017 U.S. Dist. LEXIS 198316, at *8-9 (D.S.C. Dec. 1, 2017). To prevail on its claims for trademark infringement and unfair competition under the

Lanham Act, Plaintiff must show that (1) it has a valid, protectible trademark; and (2) Defendants' use of a colorable imitation of the trademark is likely to cause confusion among consumers. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va, Inc*., 43 F.3d 922, 930 (4th Cir. 1995) (citing 15 U.S.C. § 1114).

As explained in further detail below, Plaintiff is likely to prevail on the merits of its Lanham Act claims as the evidence firmly establishes each claim element: Plaintiff indisputably owns valid and protectable trademark rights in the GEORGE SINK Marks, and Defendants' use of the nearly identical designation GEORGE SINK II in connection with identical services in the same geographical areas is likely to cause consumer confusion. Plaintiff's proof of its Lanham Act claims further establishes that Plaintiff is likely to succeed on its common law claims as well. *See Pure Supplements*, 2017 U.S. Dist. LEXIS 98861, at *7 n.5 (explaining "[b]ecause [plaintiff] is likely to be successful on its trademark infringement claim, it is also likely to be successful on its unfair trade practices claim"); *Nat'l Van Lines, Inc. v. Nat'l Van Lines, Inc.*, 2013 U.S. Dist. LEXIS 71111, at *17 (D.S.C. Mar. 25, 2013) ("Under South Carolina law, proof of trademark infringement is sufficient to establish a violation under SCUTPA."); *Scurmont LLC v. Firehouse Rest. Grp., Inc.*, 2010 U.S. Dist. LEXIS 150448, at *24 (D.S.C. May 19, 2010) ("[T]he elements of common law unfair competition and trademark infringement under South Carolina law are identical to the elements for proving a Lanham Act claim."). Accordingly, the first *Winter* factor required for a preliminary injunction is satisfied.

### A. Plaintiff Owns Valid and Protectable Trademark Rights in the GEORGE SINK Marks.

Plaintiff owns valid and protectable trademark rights in the GEORGE SINK Marks, which rights have existed for decades. Federal registration "constitutes prima facie evidence of the validity of the registered mark …, of the registrant's ownership of the mark, and of the

12

registrant's exclusive right to use the registered mark." *Emergency One, Inc. v. Am. Fire Eagle Engine Co.*, 332 F.3d 264, 268-69 (4th Cir. 2003) (quoting 15 U.S.C. § 1057(b)); *see also Hanger, Inc. v. Original Bending Brace, LLC*, 2017 U.S. Dist. LEXIS 19683, at *7-8 (D.S.C. Feb. 13, 2017) ("The Fourth Circuit has held that federal registration of a trademark is prima facie evidence that the registrant is the owner of the mark.") (internal quotations omitted) (Norton, J.).   Accordingly, the owner of a federally-registered trademark is entitled to a presumption that the mark is valid and enforceable. *Lone Star*, 43 F.3d at 930.   A federal registration that has been accorded incontestable status "provides a <u>strong presumption</u> in favor of the mark's protectibility and validity." *Id*. at 933 (emphasis added).   This presumption of validity shifts the burden to the defendant, "who must introduce sufficient evidence to rebut the presumption of plaintiff's right to such [exclusive] use." *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1529 (4th Cir. 1984) (internal quotations omitted); *see also Palmetto Ford, Inc. v. Am. Appliances & TV, Inc.*, 1999 U.S. Dist. LEXIS 23631, at *19 (D.S.C. Jul. 28, 1999).

There is no dispute that Plaintiff owns two federal registrations—the '776 and '500 Registrations—for the GEORGE SINK Marks.   (*See* DE 1-1, DE 1-2).   It further cannot be disputed that the '776 Registration has been accorded incontestable status by the United States Patent and Trademark Office.   (*See* DE 1-1).   Pursuant to its federal registrations, Plaintiff "enjoys a presumption of ownership" of the GEORGE SINK Marks. *Original Bending*, 2017 U.S. Dist. LEXIS 19683, at *8.   Furthermore, the incontestable status of the '776 Registration is "conclusive evidence of the validity of the registered Marks, of the registration of the Marks, of [Plaintiff's] ownership of the Marks, and of [Plaintiff's] exclusive right to use the Marks with the goods/services." *Wonder Works v. Cranium, Inc.*, 455 F. Supp. 2d 453, 455 (D.S.C. 2006).

Defendants will not be able to meet their "burden of overcoming the presumption—by a preponderance of the evidence—that [Plaintiff] has ownership over a valid, protectable mark." *Original Bending*, 2017 U.S. Dist. LEXIS 19683, at *9. As such, Plaintiff has satisfied the first element of its Lanham Act and common law claims.

**B.     Defendants' Use of the Designation GEORGE SINK or GEORGE SINK II is Likely to Cause Consumer Confusion.**

"[I]n the Fourth Circuit, a likelihood of confusion can be found either: (a) by a presumption based upon intentional copying; or (b) by application of the [ ] traditional factors" for finding a likelihood of confusion. *Augusta Nat'l v. Executive Golf Mgmt.*, 996 F. Supp. 492, 497 (D.S.C. 1998). The evidence demonstrates that Defendants' intentional copying and use of the designation GEORGE SINK II is likely to cause consumer confusion under both standards.

**1.     There is a presumption of a likelihood of confusion due to Defendants' intentional copying of the GEORGE SINK Marks.**

Defendant Ted Sink's background is in marketing, and he worked in marketing for over 10 years in New York City before moving to Charleston in March 2013 to work for Plaintiff's marketing department. (Sink Decl. ¶ 16). Ted Sink worked in Plaintiff's marketing department from March 2013 to March 2018, and as an attorney with Plaintiff from March 2018 to February 2019. (*Id.* ¶¶ 16-17). As Mr. George Sink's son and a former employee of Plaintiff, Ted Sink had intimate knowledge of Plaintiff's commercial success. (*Id.* ¶¶ 15-17). Furthermore, through his years in Plaintiff's marketing department, and particularly given his strong marketing background, Ted Sink was aware of the tremendous goodwill in the GEORGE SINK Marks that Plaintiff built over decades, as well as the value in Plaintiff's GEORGE SINK Marks. (*Id.*; Weidow Decl. ¶ 8). Indeed, this is corroborated by testimony that indicates that Ted Sink knew that the use of a designation confusingly similar to the GEORGE SINK Marks

14

would create issues.  (Weidow Decl. ¶ 8 ("Ted told me … because his name was the same as George's name … he could cause George a lot of trouble if he wanted to do that.")).

Defendants adopted the nearly identical designations GEORGE SINK and GEORGE SINK II for their law firm despite being fully aware of Plaintiff's prior use and their lack thereof.   The "only plausible motivation" for Defendants' actions are to "free-ride" on Plaintiff's reputation.   *Basile*, 899 F.2d at 40.   Defendants' adoption of the designations GEORGE SINK and GEORGE SINK II was done with the intent to cause consumer confusion in order to exploit Plaintiff's goodwill in the GEORGE SINK Marks.  Where, as here, there is evidence of intentional copying, "a presumption of likelihood of consumer confusion arises," and establishes the second claim element for trademark infringement.  *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 149 n.5 (4th Cir. 2012).

> ### 2. Each of the relevant *Rosetta Stone* factors weighs in favor of a likelihood of confusion.

In the Fourth Circuit, courts consider the following nine factors to guide their likelihood of confusion analysis:

(1)  the strength of plaintiff's mark;
(2)  the similarity of the parties' marks;
(3)  the similarity of the goods and services the marks identify;
(4)  the similarity of the facilities the two parties use in their businesses;
(5)  the similarity of advertising used by the two parties;
(6)  the defendant's intent;
(7)  actual confusion;
(8)  the quality of the defendant's product; and
(9)  the sophistication of the consuming public.

*Rosetta Stone*, 676 F.3d at 153.

"These factors are not always weighted equally, and not all factors are relevant in every case."  *Id.* at 154 (internal quotations omitted).  Each of the relevant *Rosetta Stone* factors weighs in favor of finding a likelihood of confusion.

### i.    The GEORGE SINK Marks are strong.

The first *Rosetta Stone* factor looks at the strength of the mark, which is "the degree to which a consumer in the relevant population, upon encountering the mark, would associate the mark with a unique source." *CareFirst v. First Care*, 434 F.3d 263, 269 (4th Cir. 2006). "The strength of a mark is evaluated in terms of its conceptual strength and commercial strength." *Id.* A mark's conceptual strength is determined by evaluating the mark's distinctiveness, as well as "the frequency of prior use of a mark's text in other marks, particularly in the same field of merchandise or service…." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 662-63 (4th Cir. 2018); *see also CareFirst*, 434 F.3d at 270 ("A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties."). The commercial strength of a mark is assessed by considering the following factors: "(1) the plaintiff's advertising expenditures; (2) consumer studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark." *Fuel Clothing*, 7 F. Supp. 3d at 613.

Even a conceptually weak mark, such as a descriptive mark, can be "a strong, distinctive mark" through secondary meaning acquired through commercial strength. *See IDV N. Am. V. S&M Brands*, 26 F. Supp. 2d 815, 822-24 (E.D. Va. 1998) (finding descriptive but commercially strong surname mark to be a strong and distinctive mark). As such, the Fourth Circuit has emphasized that a mark's commercial strength is "more important" than its conceptual strength. *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 405 F. Supp. 2d 680, 690-91 (E.D. Va. 2005), *aff'd*, 227 Fed. Appx. 239 (4th Cir. 2007); *see also Fuel*

*Clothing Co. v. Nike, Inc.*, 7 F. Supp. 3d 594, 610 (D.S.C. 2014) (explaining "[o]f these two considerations, commercial strength is more important").

Plaintiff's GEORGE SINK Marks are comprised of Mr. George Sink's full name. Although names are regarded as descriptive terms, Plaintiff's GEORGE SINK Marks are both conceptually and commercially strong. Plaintiff's GEORGE SINK Marks are conceptually strong because there is no prior use of the "George Sink" name in other marks, in the field of legal services or otherwise. *See Fuel Clothing*, 7 F. Supp. 3d at 611-612 (considering evidence of third-party registrations to evaluate conceptual strength). A search of the South Carolina and Georgia Secretary of State business records for any business operating under a GEORGE SINK-formative name yields no third-party businesses using the same or similar trade name— other than Defendants. (Exhibits 3-4). And even a Google search of the terms "George Sink" and "law" reveals no third-party businesses other than Defendants. (Exhibit 21). As the Fourth Circuit has explained:

> [T]he frequency of prior use of [a mark's text] in other marks, particularly in the same field of…service, illustrates the mark's lack of conceptual strength. A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties.
>
> Here, the record undeniably reveals substantial third-party use of the words "Care," "CareFirst," "First," and "First Care" in the health care industry. . . . If the CareFirst mark were truly a distinctive term, it is unlikely that so many other businesses in the health care industry would independently think of using the same mark or similar variants of it. That so many health care businesses have denominated themselves CareFirst or First Care indicates that "CareFirst" is not a distinctive or unusual term in the industry, and hence not conceptually strong.

*CareFirst*, 434 F.3d at 270. The same analysis applies here, and demonstrates that the GEORGE SINK Marks are conceptually strong.

As for commercial strength—which is the more important consideration between conceptual and commercial strength—the evidence demonstrates that Plaintiff's GEORGE

SINK Marks are exceedingly strong.  First, Plaintiff's advertising expenditures and sales success—which are astronomical—are alone sufficient to demonstrate the commercial strength of Plaintiff's GEORGE SINK Marks.  (Sink Decl. ¶¶ 7-13).  Plaintiff's advertising expenditures this year, from January through April 2019 alone, have been $██████.  (*Id.* ¶ 9).  Plaintiff's marketing expenditures from 2014 through April 2019 have been over $██████.  (*Id.*).  Going back further, Plaintiff's marketing expenditures from 2006 to April 2019 have been approximately $██████.  (*Id.*).  *Cf. SafeRack LLC v. Bullard Co.*, 350 F. Supp. 3d 438, 449 (D.S.C. 2018) (finding annual advertising expenditures between $925,000 and $2,560,000 for past three years evidence of commercial strength).  Plaintiff's annual gross revenue is likewise significant—in 2018, Plaintiff's gross revenue was $██████ and the forecasted revenue for 2019 is $██████.  (*Id.* ¶ 13).

There can be no reasonable dispute that Plaintiff has extensively—and successfully—promoted its personal injury law firm business under the GEORGE SINK Marks.  Independent consumer studies consistently demonstrate that Plaintiff is the law firm consumers are most likely to call for representation after an accident.  (Sink Decl. ¶ 23).  Consumer surveys looking at law firms consumers are able to "blind recall" likewise show that Plaintiff is the law firm that is most identified by consumers.  (*Id.*).  The results of these consumer studies demonstrate that Plaintiff's GEORGE SINK Marks are commercially strong.  It is thus unsurprising that, "[a]s a result of Plaintiff's efforts, its mark[s] [have] been the subject of … media attention and has achieved a high level of recognition in the [legal] field," and further evidences the commercial strength of Plaintiff's GEORGE SINK Marks.  Examples of Plaintiff's unsolicited media attention include multiple awards for "Best Law Firm" (Exhibit 5), as well as articles and online

posts evidencing recognition of Plaintiff and Plaintiff's GEORGE SINK Marks by the general public (Exhibits 6-12).

Finally, with respect to the length and exclusivity of use, Plaintiff has used the GEORGE SINK Marks since at least as early as 1997. (Sink Decl. ¶¶ 2-3, 14). Furthermore, as previously discussed with regard to conceptual strength, Plaintiff's use has been exclusive as there is no evidence of any third-party use or registration of the same or similar marks other than Defendants. (*Id.* ¶ 14; Exhibits 3-4, 21). The record clearly establishes the conceptual and commercial strength of Plaintiff's GEORGE SINK Marks such that consumers, upon encountering Plaintiff's GEORGE SINK Marks, would not only "associate the mark[s] with a unique source," but further recognize them as a source-identifier specifically for Plaintiff's legal services. Accordingly, the first *Rosetta Stone* factor—which is the "paramount factor"—weighs heavily in favor of finding a likelihood of confusion. *Pizzeria Uno*, 747 F.2d at 1527.

### ii.     The parties' marks are nearly identical.

In assessing the similarity of the parties' marks, "the Fourth Circuit has directed that district courts focus on the dominant portion of the parties' marks and consider whether there exists a similarity in sight, sound, and meaning which would result in confusion." *Fuel Clothing*, 7 F. Supp. 3d 594, 615 (D.S.C. 2014) (internal quotations omitted); *see also Palmetto*, 1999 U.S. Dist. LEXIS 23631, at *14 ("When comparing the parties' mark[s], the court looks primarily to the dominant word in a composite word trademark.") (internal quotations omitted). Moreover, "a judge is free to draw upon his own experience and observation to make an informed judgment as to the likelihood of confusion apt to be spawned by strongly analogous symbols." *Volkswagenwerk AG v. Hoffman*, 489 F. Supp. 678, 682 (D.S.C. 1980).

District courts in the Fourth Circuit, including this Court, routinely find marks to be similar when there is overlap in the critical or dominant portion of the respective marks. *Palmetto*, 1999 U.S. Dist. LEXIS 23631, at *27; *see also Lone Star Steakhouse*, 43 F.3d at 936 (finding marks LONE STAR STEAKHOUSE and LONE STAR GRILL similar). For example, in *Nutramax Labs., Inc. v. Nutra Max Labs Inc.*, this Court recently found that the defendant's NUTRA MAX LABS was similar to and infringing the plaintiff's NUTRAMAX LABORATORIES mark. 2017 U.S. Dist. LEXIS 174064 (D.S.C. Oct. 20, 2017). As another example, in *Pure Fishing, Inc. v. Redwing Tackle, Ltd.*, this Court found that the defendant's SPIDER THREAD mark was similar to and infringing the plaintiff's family of SPIDER-formative marks. 888 F. Supp. 2d 726, 733 (D.S.C. 2012). Likewise, Plaintiff's and Defendants' respective marks both "use the same dominant first term [GEORGE SINK] which weighs in favor of finding the parties' marks similar." *Palmetto*, 1999 U.S. Dist. LEXIS 23631, at *27.

There is no reasonable dispute that the parties' marks are similar. Because the dominant portion of Plaintiff's and Defendants' marks are identical in appearance, sound, and meaning, this *Rosetta Stone* factor also weighs in favor of finding a likelihood of confusion.

### iii.     The parties' services are identical.

This factor "measure[s] the similarity of services with respect to each party's actual performance in the marketplace." *CareFirst*, 434 F.3d at 272. Plaintiff is a law firm and offers legal services focused on personal injury, workers' compensation, social security disability, and veterans disability cases. (Sink Decl. ¶ 4). Defendants Sink II, Sink II, and SLA are also a law firm, and Defendants likewise offer legal services focused on personal injury, workers' compensation, social security disability, and veterans disability cases. (*See* Exhibits 13-14, 18-

19). The parties' respective legal services here are not just similar, they are identical and in direct competition. *Cf. H. Jay Spiegel & Assocs., P.C. v. Spiegel*, 652 F. Supp. 2d 639, 650 (E.D. Va. 2009) (evaluating similarity of legal services by considering overlap in practice areas). Accordingly, this *Rosetta Stone* factor further supports a finding of a likelihood of confusion.

*iv.      The parties' facilities overlap.*

This factor examines "the similarity of [the] retail facilities and trade channels used to market the two lines of products." *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 661 (4th Cir. 1996). Both parties are based in South Carolina, with a presence overlapping in Charleston, and use physical law offices and the Internet for offering identical legal services. (Sink Decl. ¶¶ 5, 8; *see* Exhibits 19-20). *See Tropical Nut & Fruit Co. v. Forward Foods, LLC*, 2013 U.S. Dist. LEXIS 81232, at 8* (W.D.N.C. June 10, 2013) (finding similarity of the parties' facilities where "[b]oth parties compete directly on the internet" for similar goods and services).

Plaintiff uses the Internet to offer its legal services through a website with the domain names, *inter alia*, <sinklaw.com>, <georgesink.com>, and <georgesinklaw.com>. Defendants also use the Internet to offer their legal services through a website using the nearly identical domain name <georgesinklawfirm.com>. (Sink Decl. ¶ 8; *see* Exhibit 18). "[I]t is significant that both parties are using the Internet to provide the relevant services and that the domain names of the parties' websites are very similar." *Inst. For Justice v. Media Grp. of Am., LLC*, 2015 U.S. Dist. LEXIS 161264, at *23-24 (E.D. Va. Nov. 30, 2015) (citing *Cardservice Int'l, Inc. v. McGee*, 950 F. Supp. 737, 741 (E.D. Va. 1997), *aff'd*, 129 F.3d 1258 (4th Cir. 1997). Furthermore, a Google search results show that a consumer in Charleston searching for the

21

phrase "george sink" will get Google Business listings for both Plaintiff and Defendants right next to teach other.  (Sink Decl. ¶ 24).

The parties also "cater to the same customers" in overlapping geographic areas and, in fact, have an overlap in actual customers.  (Sink Decl. ¶ 19).  *Lone Star*, 43 F.3d at 937 (considering overlap in customers in finding similarity of facilities).  "These similarities, especially the fact that their [legal] services attract many of the same customers, further work to satisfy … similarity of the facilities" factor.  *Lone Star*, 43 F.3d at 937.  Accordingly, this *Rosetta Stone* factor further supports a finding of a likelihood of confusion.

> v.    The parties' advertisements are similar and overlap.

In assessing the similarity of advertising, courts consider a variety of factors including "the media used, the geographic areas in which advertising occurs, the appearance of the advertisements, and the content of the advertisements." *CareFirst*, 434 F.3d at 273.  Plaintiff and Defendants use the same online platforms—namely, Facebook, Google business, and websites—to advertise their identical legal services within the same geographic areas.  (Sink Decl. ¶¶ 8, 20); *see* Exhibits 18-19).  *Fuel Clothing*, 7 F. Supp. 3d at 620 (finding similarity of advertising where, *inter alia*, "[b]oth parties advertise through the Internet"); *see also La Michoacana Natural, LLC v. Maestre*, 2018 U.S. Dist. LEXIS 93441, *7-9 (W.D.N.C. June 1, 2018) (finding likelihood of confusion where both parties utilized "internet websites, and Facebook pages to promote their businesses and each of the parties' … stores [are] located in the same general proximity").  Furthermore, given that the parties' legal services are identical— namely, both focus their legal services in the area of personal injury—the imagery, language, and commercial impression of the advertisements are the same.  For example, Defendants advertise on Facebook by prominently featuring a photograph of an automobile accident.

Plaintiff similar images, including photographs of automobile accidents, to advertise its legal services. (*Compare* Exhibit 19 *with* Exhibit 20). Accordingly, this *Rosetta Stone* factor further supports a finding of a likelihood of confusion.

> vi. *Defendants intend to capitalize on Plaintiff's goodwill by inducing consumer confusion.*

"The intent of the defendant is sometimes a major factor in infringement cases." *Pizzeria*, 747 F.2d at 1535. As described above to show intentional copying, Defendant Ted Sink was an employee of Plaintiff, and was well aware of Plaintiff's goodwill and reputation associated with the GEORGE SINK Marks. (Sink Decl. ¶¶ 16-18). And Defendants' intent to exploit Plaintiff's goodwill by using a confusingly similar business name can be inferred from the circumstances: Defendants adopted a nearly identical mark for identical services within the same geographic areas despite having actual and intimate knowledge of Plaintiff's trademark rights. *See Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 168 (4th Cir. 2012) (finding that "the inference of an intent to deceive could hardly be stronger on this record").

Nor can Defendants argue that their adoption of the nearly identical business names GEORGE SINK LAW FIRM and GEORGE SINK II LAW FIRM was in good faith by virtue of the fact that Defendant Ted Sink's legal name is "George T. Sink, Jr." Up until recently, Ted Sink has always used a shortened version of his middle name Theodore, and has been known as "Ted" or "Teddy" throughout his entire life. (Sink Decl. ¶ 15; Weidow Decl. ¶ 4; *see* DE 1-5). Ted Sink's recent decision to be recognized as "George Sink" was not born out of a desire to utilize his legal name, but from his intent to capitalize on the existing goodwill and trademark rights in Plaintiff's GEORGE SINK Marks as he endeavors with the other Defendants to establish a competing law firm. Accordingly, this *Rosetta Stone* factor further supports a finding of a likelihood of confusion.

23

*vii.    There has been actual confusion.*

Actual confusion is one of the most important factors, and evidence of such "ends [a court's likelihood of confusion] inquiry almost as soon as it begins." *Fuel Clothing*, 7 F. Supp. 3d at 621. Despite the very short period of concurrent use, there have already been at least two instance of actual confusion. On March 7, 2019, lien information requested by Ted Sink from the email address "georgesink@gmail.com" was mistakenly sent to Plaintiff by a vendor. (Sink Decl. ¶ 19). When Plaintiff's staff member explained that Plaintiff was not representing the client, the vendor asked: "Are there two different law firms now for George Sink? I am confused. Thanks." (*Id.*). Most recently, on May 10, 2019, Plaintiff received a call from a local bank to verify a check issued by Defendants and not Plaintiff. (*Id.* ¶ 22). Prior to Defendants offering legal services under the business names GEORGE SINK LAW FIRM and GEORGE SINK II LAW FIRM, Plaintiff has never received a call to verify a check issued by another law firm. (*Id.*). Accordingly, this *Rosetta Stone* factor further supports a finding of a likelihood of confusion.

*viii.    The quality of Defendants' services.*

"Consideration of the quality of the defendant's product is most appropriate in situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods." *Sara Lee*, 81 F.3d at 467. This case does not involve such circumstances, and this factor is not relevant to the likelihood of confusion analysis in this case.

*ix.    The sophistication of the consuming public.*

Buyer sophistication is only a relevant factor "when the relevant market is not the public at-large." *Sara Lee*, 81 F.3d at 467. The relevant market for both parties' legal services is the general public and, as such, this factor is likewise not relevant to the likelihood of confusion

analysis in this case.

As shown above, each of the relevant *Rosetta Stone* factors weigh heavily in favor of finding a likelihood of confusion. Because the record establishes Plaintiff's trademark rights and a likelihood of confusion, Plaintiff has demonstrated that it is likely to succeed on the merits of its claims.

## II.  PLAINTIFF HAS AND WILL CONTINUE TO SUFFER IRREPARABLE HARM.

"When analyzing the irreparable harm element, there are two inquiries: (1) whether the plaintiff is indeed suffering actual and imminent harm; and (2) whether that harm is truly irreparable, or whether it can be remedied at a later time with money damages." *Pure Supplements*, 2017 U.S. Dist. LEXIS 98861, at *9. "In a Lanham Act trademark infringement case in the Fourth Circuit, 'a presumption of irreparable injury is generally applied once the plaintiff has demonstrated likelihood of confusion, the key element in an infringement case.'" *La Michoacana*, 2018 U.S. Dist. LEXIS 93441, at *9-10 (quoting *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002)); *see also Lone Star*, 43 F.3d at 939 ("Infringement gives rise to irreparable injury, in that plaintiff has lost control of its business reputation to this extent, there is substantial likelihood of confusion of the purchasing public, there may be no monetary recovery available, and there is an inherent injury to the good will and reputation of the plaintiff."); *Surf's Up, LLC v. Rahim*, 2017 U.S. Dist. LEXIS 200916, at *27 (D.S.C. Nov. 14, 2017) (granting injunctive relief noting that "Lanham Act plaintiffs need not … offer specific evidence of irreparable injury, given that irreparable injury regularly follows from trademark infringement") (internal quotations omitted); *Original Bending*, 2017 U.S. Dist. LEXIS 19683, at *22-23 ("In Lanham cases involving trademark infringement, a presumption

of irreparable injury is generally applied once the plaintiff has demonstrated a likelihood of confusion.") (Norton, J.).

As explained in Section I, *supra*, Plaintiff is likely to succeed on its Lanham Act and common law claims, and irreparable harm from Defendants' infringement can be presumed. Furthermore, additional and more significant irreparable harm to Plaintiff is imminent if Defendants are not enjoined. Whereas Plaintiff has experienced attorneys who have been practicing for decades handling and overseeing cases, Ted Sink only started practicing law in March of 2018. (Sink Decl. ¶ 17). Given the likelihood of confusion shown here, any client dissatisfaction or poor case outcomes due to Ted Sink's inexperience and/or inferior legal services may be attributed to Plaintiff and damage Plaintiff's reputation and goodwill in the GEORGE SINK Marks.

In addition to the foregoing, Defendants are on the cusp of a major undertaking to capitalize unlawfully on Plaintiff's trademark rights. Accordingly, Plaintiff has established the requisite actual and imminent irreparable harm, and this *Winter* factor "favors entry of a preliminary injunction." *Augusta*, 996 F. Supp. at 496 (finding irreparable harm based on presumption arising from showing likelihood of success on infringement claim and granting preliminary injunction); *see also Surf's Up, LLC v. Rahim*, 2017 U.S. Dist. LEXIS 200916, at *27 (D.S.C. Nov. 14, 2017) (granting injunctive relief finding irreparable injury following from infringement); *Nutramax Labs., Inc. v. Pure Supplements Ltd.*, 2017 U.S. Dist. LEXIS 98861, at *9-10 (granting preliminary injunction based on actual confusion and presumption).

## III.    THE BALANCE OF EQUITIES TIPS HEAVILY IN PLAINTIFF'S FAVOR

In evaluating this factor, a court "must balance the immediate and irreparable harm to the plaintiff against any harm to the defendant." *La Michoacana*, 2018 U.S. Dist. LEXIS, at *9-

10.  On the one hand, the record evidence and testimony demonstrate that Plaintiff's trademarks have been in use for over two decades, in as many as thirteen offices throughout South Carolina and Georgia.  *Id.* (finding balance of equities favored a preliminary injunction).  Plaintiff has further "invested millions of dollars and significant time and effort in advertising, promoting, and developing its trademarks, and establishing substantial goodwill in its intellectual property." *Pure Supplements*, 2017 U.S. Dist. LEXIS 98861, at *12 (finding balance of equities favored and granting a preliminary injunction).  Moreover, as explained above, Plaintiff is suffering and will continue to suffer irreparable harm without an injunction.

On the other hand, Defendants would not suffer any cognizable harm "that would counterbalance the likely irreparable harm to Plaintiff's goodwill and its revenue" from its longstanding GEORGE SINK Marks.  *La Michoacana*, 2018 U.S. Dist. LEXIS, at *9-10. Defendants Sink II, Sink III, and SLA have only been in existence for three months, and Defendants have only been using the designation GEORGE SINK II for a few months at most. Moreover, [Defendants'] unauthorized use of [Plaintiff's] registered [GEORGE SINK Marks] is a calculated and purposeful attempt to confuse consumers" by implying a relationship between the parties.  *Pure Supplements*, 2017 U.S. Dist. LEXIS 98861, at *12.  Any purported hardships Defendants claim they will suffer as a result of a preliminary injunction would be self-inflicted by virtue of their own intentional and willful misconduct.  Defendants have "no equitable interest in perpetuating false claims regarding the origin of its [services]," and their attempt to confuse consumers "is not deserving of any legal protection."  *Id.*

Defendants would not be enjoined from offering legal services; rather, Defendants would be prevented from offering legal services under Plaintiff's GEORGE SINK Marks. Defendant Ted Sink would not be enjoined from using his legal name; rather, Ted Sink would

be prevented from using the name "George Sink" as the business name of his competing law firm.  The requested preliminary injunction "does not prohibit [Defendants] from working in the [legal industry] in [South Carolina] or throughout the United States.  Rather, it merely prohibits [them] from using the same name as [Plaintiff] in an identical industry in order to prevent [them] from creating confusion and irreparable harm until there is a trial on the merits on Plaintiff's claims."  *Hyperheal Hyerbarics, Inc. v. Shapiro*, 2018 U.S. Dist. LEXIS 151595, at *32 (D. Md. Sept. 6, 2018) (granting preliminary injunction).

"[T]he only hardship that would befall Defendants by granting Plaintiff's request[ ] would be the requirement to follow clearly established trademark law."  *Juul Labs, Inc. v. Unincorporated Ass'n Indentified in Schedule A*, 2019 U.S. Dist. LEXIS 60745, at *15 (E.D. Va. Mar. 20, 2019).  Accordingly, the balance of equities favor entering a preliminary injunction.

## IV.    THE PUBLIC INTEREST WEIGHS IN FAVOR OF PLAINTIFF

The public interest is served by granting a preliminary injunction if it "prevent[s] customer confusion in the marketplace…."  *Pure Supplements*, 2017 U.S. Dist. LEXIS 98861, at *12; *see also Augusta*, 996 F. Supp. at 499 ("The right of the public to be free from the deception that results from a defendant's use of a plaintiff's trademark is transcendent.").  "In addition, protecting the interest of trademark owners serves the public interest."  *La Michoacana*, 2018 U.S. Dist. LEXIS 93441, at *10-11.  Thus, entering a preliminary injunction in this case serves the public interest.

## CONCLUSION

For the foregoing reasons, all four factors necessary for a preliminary injunction are established, and Plaintiff requests that the Court grant its Motion for Preliminary Injunction and

order the following relief: prohibit Defendants from using the designations GEORGE SINK or GEORGE SINK II, or any other similar GEORGE SINK-formative designation; remove GEORGE SINK-formative references, including the email address "georgesink@gmail.com" and website <georgesinklawfirm.com>, from all profiles, including the State Bar directories and social media accounts; and whatever other relief the Court deems just and equitable.

Date: May 15, 2019              Respectfully submitted,

s/ Trudy H. Robertson
Trudy H. Robertson
Federal ID No. 6211
MOORE & VAN ALLEN PLLC
78 Wentworth Street
Charleston, SC 29401
Telephone: (843) 579-7061
Facsimile: (843) 579-8722
E-mail: trudyrobertson@mvalaw.com

Allan R. Holmes (Fed. ID# 1925)
Cheryl H. Ledbetter (Fed. ID# 11446)
GIBBS & HOLMES
171 Church Street, Suite 110
Charleston, SC 29401
(843) 722-0033 (telephone)
(843) 722-0114 (facsimile)
E-mail: aholmes@gibbs-holmes.com
       cledbetter@gibbs-holmes.com

J. Mark Wilson (*pro hac vice application
forthcoming*)
N.C. State Bar No. 25763
Kathryn G. Cole (*pro hac vice application
forthcoming*)
N.C. State Bar No. 39106
Minnie Kim (*pro hac vice application forthcoming*)
N.C. State Bar No. 46173
MOORE & VAN ALLEN PLLC
100 North Tryon Street
Suite 4700
Charlotte, North Carolina 28202
Telephone: (704) 331-1000
Facsimile: (704) 331-1159
E-mail: markwilson@mvalaw.com
       katecole@mvalaw.com
       minniekim@mvalaw.com

*Attorneys for Plaintiff George Sink, P.A.
Injury Lawyers*