UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| GEORGE SINK, P.A. INJURY LAWYERS, | ) Civil Case No. 2:19-cv-01206-DCN |
| Plaintiff, | ) |
| v. | ) **AFFIDAVIT OF DEFENDANT** |
| | ) **GEORGE T. SINK, JR.** |
| GEORGE SINK II LAW FIRM, LLC, | ) |
| GEORGE SINK LAW FIRM, LLC, | ) |
| SOUTHERN LEGAL ASSOCIATION, LLC, | ) |
| and GEORGE ("TED") SINK, JR., | ) |
| Defendants. | ) |

**PERSONALLY**, appeared before me, the undersigned Notary Public, the Affiant, George T. Sink Jr, who being duly sworn stated as follows:

1. I am a competent adult over the age of eighteen and can testify to the following of my own personal knowledge.

## OVERVIEW

2. I am attorney George Sink. My legal name is George T. Sink, Jr. My name was given to me by my father in 1979. (Exhibit A)

3. I am the son of attorney George Sink, Sr, who is called "GT" by some of his closest family, including his sisters. (Exhibit B) (hereinafter "my father").

4. I was raised in a family with three George Sinks. Before my father, my grandfather was also George Sink. "George Sink" is a family name. (Exhibit C, picture of Three George Sinks).

5. My father's law firm is named "George Sink, P.A. Injury Lawyers" ("GSPAIL" is the acronym most prefer to use within the firm and will be used hereinafter) and GSPAIL is suing me.

6. My father has told me he owns 99% of GSPAIL and determines its actions. I believe my father has directed his company to sue me and attempt to impede my ability to practice law under the name he gave me and promoted me under.

7. The claims brought against me in this lawsuit are subject to an agreement between the parties, titled the "Confidentiality and Non-Solicitation Agreement." This agreement was intended to prevent lawsuits and exactly the type of public sideshow which

1

Plaintiff has created by bringing suit. (Exhibit D, which is also Plaintiff's Exhibit 2 in their Amended Demand for Arbitration).

8. To avoid this exact type of public litigation and to buy my peace, I have tendered to Plaintiff the $500.00 pursuant to the "Confidentiality and Non-Solicitation Agreement" even though GSPAIL has not been damaged in any manner and I have not breached this agreement in any manner. (Exhibit E.)

9. Plaintiff repeatedly held me out to be "George Sink," "George Sink, Jr" or "attorney George Sink" to the legal community, to his staff and to the public at large. (Exhibits F, G, H, I, J).

10. Plaintiff held me out as "George T. Sink" to the Department of the Treasury, IRS, and Health Insurers. Plaintiff did not use "Jr.," but calls me "George T. Sink" (see Exhibit G)

11. Plaintiff called me "attorney George Sink" in millions of dollars' worth of media: television commercials, press interviews, public speeches, events, radio spots, internet marketing and on more than a million Christmas cards. (Exhibits F, G, H, I, J).

12. GSPAIL has spent millions of dollars' worth of media to introduce the public to the idea that there are two different attorneys named George Sink, one a father and the other his son.

13. I believe this lawsuit, and the remarkable change in my father's position toward me, is related to his desire to sell GSPAIL.

14. My father has been planning to sell GSPAIL He has been reviewing plans for doing the future sale since at least 2017. I have been present for these discussions. (Exhibit L and M)

15. I became concerned that the sale of GSPAIL might result in all of the resources of a multimillion-dollar law firm being used to push me out of the practice of law (Exhibit L and M)

16. I was told that my name and ability to practice law were causing issues with the plan to sell the GSPAIL.

17. Plaintiff demanded I sign away rights to my name and rights to practice any type of law that the Plaintiff practiced. Despite repeated demands to sign away these rights, I did not sign. I believed signing the agreement would violate Rule 5.6 of the Rules of Professional Conduct.

18. In one of our final in-person meetings, my father stated that my impending termination from GSPAIL was as a result of my refusal to sign a contract to assign all rights in my name and image to GSPAIL.

19. Within 36 hours of my father expressing frustration that I would not sign away the rights to my name, image and ability to practice law freely, my father fired me.

20. My father fired me by email. I was fired three days before my 40th birthday. I have never been fired before from any job.

21. I believe this lawsuit is my father's attempt to sell my name and my future along with his law firm, GSPAIL.

## MY NAME

22. George Sink is the only name I have ever had.

23. Plaintiff asked that I be known as "George" at GSPAIL. Plaintiff demanded that no one at his firm should call me Ted. Plaintiff's President would stop people who called me Ted and correct them. GSPAIL worked hard to ensure everyone referred to me publicly as "George Sink." (Exhibits F, G, H, I, J, K)

24. The vast majority of people I know in this world know me as George. (Exhibit O, P)

25. In practicing law, I am George. At law school, I was George. In GSPAIL's advertising to millions of people, I am called George. I am George. (Exhibits F, G, H, I, O, P)

## PLAINTIFF HOLDS ME OUT AS "ATTORNEY GEORGE SINK"

26. In the meeting introducing me to everyone at GSPAIL, my father held me out as "George T. Sink," as he also did in his introductory email, on my GSPAIL business cards, on the firm's website and in GSPAIL advertisements – even on hundreds of thousands of Christmas cards. (Exhibits F, G, H, I).

27. Plaintiff held me out to the public as "attorney George Sink." Again, no "Jr" was used when my name was spoken. (Exhibits F, G, H, I)

28. My father expressed his opinion that advertising both men as "George Sink" was not confusing nor misleading, since that is the true name of each man.

29. He said, "I grew up in a family with two George Sinks; no one was ever confused" and that "all of George Forman's sons are named George Forman as well and it's not confusing." "People always know who you're talking to and talking about."

30. Plaintiff believed in this so much that he made himself "George Sink" in the GSPAIL email system and made me "George T Sink." His written order indicates that he believed this was sufficient distinction between our names.

31. Plaintiff hired Ethics attorneys to review his proposal to call us both "George Sink" in advertising. (Exhibit Q,)

32. On March 31st, 2014, I wrote GSPAIL's ethics attorneys to ensure they applied a high standard for avoiding confusion, writing:
    a. "What would we have to do to make 100% certain that we keep myself and the firm safe?";
    b. I point out that "We've included Jeannette and Alex (Stepmother and Brother) several times [in video advertising], but it may be more complicated because I am George T Sink, Jr." and,
    c. "Given that I, George Sink Jr, am not a lawyer and don't wish to represent myself as such, how can I keep our firm safe (and myself too)?" [NOTE: This letter was written while I was in law school and not yet a lawyer.] (Exhibit Q)

33. The ethics attorneys reviewed the issues and stated that calling both men "George Sink" was not prohibited by the Rules of Professional Conduct, which prohibits confusing or misleading messages, especially ones in which an attorney and non-attorney might be misidentified. (Exhibit Q)

34. As a result of GSPAIL's discussion with ethics counsel, confirming my father's opinion that it was not confusing to have two George Sinks, so long as it is properly disclosed, we agreed as follows:
    a. When our names are spoken aloud, we would be "George Sink;" and,
    b. When in a video or print advertisement, we would be further distinguished in writing as "George Sink Sr" and "George Sink Jr," in the disclaimer/ disclosure section of video or print advertisements.

35. The plan to introduce "Two George Sinks" as part of GSPAIL's marketing strategy was written down, approved by both George Sinks and presented publicly to outside lawyers and consultants more than once, in both 2016 and 2017. (Exhibit K)

36. This "Two George Sinks" plan was followed and worked. (Exhibit K and I)

37. Several TV commercials show both George Sinks, where both father and son are referred to as "George Sink." Each attorney George Sink says "I'm attorney George Sink" and then the other George Sink says "and I'm attorney George Sink." (Exhibit I)

38. Even after suing me to remove my name, Plaintiff still refers to me as "George Sink Jr" or "George Sink" on GSPAIL's own website (Exhibit J)

## GIVING UP A SUCCESSFUL CAREER

39. After graduating from Yale, I moved to New York City and accepted a job for $18,000 a year.

4

40. Through years of hard work, I was able to help enough clients and teammates that I eventually earned approximately 10x my starting salary.

41. I was a leader in a large team that received top advertising awards and awards for marketing effectiveness. I had worked hard for over a decade to get where I was.

42. Throughout my career, my father courted me to move back and work for him, with offers that increased over the years.

43. My father stated words to the effect that I'd have "every opportunity in the world" to take over GSPAIL and that "so long as you put in a little work, you will take over the firm."

44. Based on my father's promises, I applied for law school at University of South Carolina and was accepted in 2005/6. In 2006, I prepared to move to South Carolina. I quit my job and lived in South Carolina for a month, familiarizing myself with Columbia, South Carolina and the law before beginning law school.

45. After I quit my job and relocated, my father wavered in his promises and no longer declared them with certainty. He refused to reaffirm his word once he felt I had committed to him by quitting my job.

46. As a consequence, I left. I didn't go to law school in 2006, because the opportunity with my father did not seem real at the time. Instead, I went to Stanford's Graduate School of Business for a summer program and then accepted another job for more money and with more potential.

47. This happened more than once. My father would entice me to change direction and join GSPAIL, only to change the terms of the deal. When he did that, I would leave and go back to my ever-more-successful career. My father continued to ask me to work for him and offered more assurances to satisfy me, improving his offers, to convince me to stay.

48. In late 2012 and early 2013, my father saw that I was seriously considering a high-placed executive role at two major technology companies and revisiting a highly-placed role at entertainment company, any of which would have forever ended the likelihood of us working together.

49. As a result: he made his biggest pitch to have me join GSPAIL beginning around Sept 2012:
    a. My father told me that his law firm, GSPAIL, was in trouble and needed help; claimed the business was struggling and he was "alone" in trying to fix it;
    b. He said that the type of marketing and business consulting expertise I demonstrated for my clients was exactly what GSPAIL needed to survive and get back on track;

5

c. Then my father told me about a serious health issue with his heart. He said he might not have the strength to do what was needed to help the business. He said he needed me; and,
d. He said he knew I had other good options, so he would "remove the risk for me" and try to make his offer irresistible by:
    i. Increasing his severance offer of up to $1.5 million, saying this was a "no lose" offer. The severance had been up to $80,000. He increased it substantially, in recognition of the additional risk.
    ii. Promising he would not be verbally abusive (as he sometimes is) or interfere with my personal life (he likes to meddle/ control, he had repeatedly directed me to marry ex-girlfriends, for example). He promised to be patient even on the difficult days and give me "every opportunity to succeed."
e. I was concerned that he already had other lawyers at GSPAIL helping with management and they would always have more years of experience. I said I was walking into a "no-win situation for me." In response, my father said "your name will be your protection;" and "that's your name – something no one can take away from you." You'll be George Sink and it will be natural to have you lead the firm.
f. He promised to do these things, began to do these things, but eventually broke those promises once he had my help and GSPAIL was thriving again.
g. All of these promises were part of the agreement to have me work for GSPAIL.
h. I relied on these promises to my detriment.

## PLAINTIFF'S EFFORTS TO TRANSFER THE "GEORGE SINK" BRAND TO ME

50. Plaintiff wanted me to be included in GSPAIL's advertising and I was reluctant to do so until after Plaintiff and I made agreements to protect me.

51. Growing up, I avoided attempts to be included in advertising for my father's law practice. Consequently, I was the only member of the nuclear family who asked not to be in my father's TV ads. I did not want to be in the firm's Holiday advertising. My father encouraged me to approve of his advertising and join him in it.

52. Being featured in GSPAIL's advertising and being in the public eye was not my fondest wish. It was something I accepted I had to do as part of Plaintiff's agreement that I would one day take over GSPAIL. If I were to take over GSPAIL, my father said, I would need to be in the advertising.

53. In reaching an agreement to come work for him, my father said that he wanted me to appear in commercials and marketing, to appear at community events and train as a firm spokesperson in preparation to take over GSPAIL one day, and, as a part of our agreement, he wanted me to be called "George Sink."

6

54. My father told me that being called George Sink had significant benefits to me. He told me that, if I was George Sink, I would have the name forever and it would "protect me forever."

55. He promised GSPAIL would put considerable resources into transferring the brand name over to me, in the eyes of the public. He told me I would not have to include "Jr" in my name because he knew one of my major objections was that I didn't want to be called Junior. This is reflected in his instructions to staff as to what I should be called (Exhibit F), what he calls me to the government (Exhibit G) and what I am called in TV Advertisements: "George Sink."

56. On March 22, 2103, my father emailed the head of IT at GSPAIL to:
    a. "Set up my son, George T Sink Jr in our system as "George T Sink." Make me "George Sink." (Exhibit F)

57. Below are key phrases from TV commercials recorded by George Sink, P.A. Injury Lawyers and approved by George Sink, Sr.
- I'm attorney George Sink and this is my son… attorney George Sink ("Side by Side 30")
- I'm attorney George Sink and I'm attorney George Sink ("9 Seconds")
- I'm attorney George Sink and I'm attorney George Sink ("Pyramid")
- I'm attorney George Sink and I'm attorney George Sink ("Gone")
- Similar language was used in TV spots like Barber Shop :30, Yorktown :30 and others.
- A TV script was also approved and produced (though not aired to my knowledge) called "Two George Sinks." George Sink Sr and George Sink Jr both appear.
    - George Sink Jr: I'm attorney George Sink. If you've been hurt in a car wreck
    - Client: Hey! I thought he was George Sink!    …George Sink Sr appears on camera
    - George Sink Sr: I am! And he is too. I'm proud to say there are now Two George Sinks serving injured people
    - George Sink Jr. Thanks, Dad. George Sink Injury Lawyers has over 40 attorneys to serve you
    - Client: …including Two George Sinks!
- George Sink, Sr. reviewed and approved all of these scripts and he spent millions of dollars to broadcast TV spots which call his son "George Sink."
- George Sink, Sr's handwriting appears on multiple drafts of the script.

58. The consistent presentation of the two George Sinks was not an accident. It was a result of agreements, negotiated by and between the parties.

59. The free use of my name – within GSPAIL or without – was one of the key promises used to induce me to join the firm. My father told me "stop building other people's brands; work with me and Be the brand."

60. GSPAIL issued a credit card to me in my name, George Sink.

7

61. At the time Plaintiff applied for a trademark on the name "George Sink" in the legal category, Plaintiff claimed they already had a trademark for "George Sink, P.A. Injury Lawyers."

62. After I filed a Letter of Protest with the USPTO (US Patent and Trademark Office) the Plaintiff removed their application for the exclusive trademark to the name "George Sink" in the legal services category.

63. In his Trademark application, my father swears under penalty of perjury that:
    "to the best of the signatory's knowledge and belief, no other person has the right to use the mark in commerce, either in identical form or in such near resemblance as to be likely …to cause confusion or mistake or to deceive." (Exhibit A1)

64. In their applications, my father and GSPAIL failed to disclose to the USPTO that there was another attorney George Sink who had rights to use his name. (Exhibit A1)

65. In the days before I was fired, Plaintiff offered me money to change my name and give up the practice of law in South Carolina or Georgia.

## MAJOR LIFE ACHIEVEMENTS AS "GEORGE SINK"

66. George Sink is my personal name and a name under which I have built up my personal reputation and personal brand, separate and apart from GSPAIL.

67. My High School Diploma says "George T. Sink, Jr." (Exhibit P)

68. My degree from Yale says "George T. Sink, Jr." (Exhibit P)

69. My law school degree says "George T. Sink, Jr." (Exhibit P)

70. I have used the Gmail georgesink@gmail.com continuously since 2006. This was many years prior to joining GSPAIL in 2013. (Exhibit O)

71. I've been George Sink in Facebook since at least 2009. This was years before joining GSPAIL. (Exhibit O)

72. My name has been established in the practice of law as George Sink, including in:
    a. South Carolina Bar
    b. Georgia Bar
    c. American Bar Association
    d. Georgia Court of Appeals
    e. Georgia Supreme Court
    f. Federal District Court, Northern District of Georgia (Exhibit P)

73. I have built a name for myself as George Sink, including but not limited to the following:

8

   a. Trial Advocacy Champion, 2016
   b. "Best Opening Statement" award in Charleston Trial Advocacy Competition
   c. Finalist in Savannah Trial Advocacy Competition
   d. Charlotte Trial Advocacy Competition - won our round against Duke
   e. CALI award for top performance in certain law school classes
   f. Performance for my clients
   g. Testimonials by my past clients
   h. Community outreach in multiple churches, supporting charitable activity
   i. On stage at the Gospel Choir Showcase, in front of huge crowds
   j. On stage at the Latin American Festival
   k. On the radio
   l. On TV: Cell Phones for Soldiers, Support of our Coast Guard, Jefferson Awards, Scholar/Athlete Award check presentation, to name a few
   m. Reputation in the community
   n. Many various awards and recognitions (Exhibit P)

74. I have been quoted or referenced in many publications as George Sink, including but not limited to:
   a. The LA Times, regarding arbitration agreements
   b. USA Today
   c. Today.com (The Today Show's online presence.)
   d. ABA Journal
   e. ABC, CBS, NBC, Fox
   f. The Post and Courier
   g. The State
   h. Myrtle Beach Online
   i. Daily Beast
   j. South Carolina Lawyers Weekly
   k. And many other places (Exhibit P)

75. GSPAIL sought to associate with me and my personal accomplishments for their own profit.
   a. Georgia License. I am the only attorney George Sink licensed in Georgia
      a. By the Georgia Supreme Court
      b. Georgia Court of Appeals
      c. Federal District Court of Georgia, Northern Division
      d. Georgia is a huge market for GSPAIL and its major competitors are licensed in Georgia. George Sink Sr is not.
      e. At one time, my father said he thought he could not advertise competitively in Georgia without having an attorney George Sink with a Georgia License to practice law.
      f. GSPAIL began moving into Georgia only after I had taken the Georgia bar exam.
      g. I was the first employee of GSPAIL to be in our Savannah, GA office. My name and licenses were used in the Georgia advertising for quite some time,

9

with GSPAIL trying to diminish the disclosure that George Sink, Sr is not licensed in Georgia
   h. The disclaimer is written like this: "George Sink, Jr licensed in GA, SC. George Sink, Sr. licensed in SC."   (Exhibit P)
b. GSPAIL benefitted by implying to the public that there will be a younger "attorney George Sink" at the law firm for a long time.  Calling me "attorney George Sink" in the advertising, side by side with George Sink Sr. to make people think that GSPAIL will continue to be run in a similar fashion even after there's no more George Sink Sr working there at all.  GSPAIL attempted to create the impression that I will be working at the firm and ensuring continuity of services as my father ages.

## JOB PERFORMANCE AT GSPAIL

76. I joined my GSPAIL in March 2013.

77. In April and May of 2013, top consultants reviewed the firm and said it was headed for "disaster" and "financial ruin."   My father worried this would scare me away and I would leave GSPAIL. It did not.  It motivated me to help GSPAIL and my father.   I was a part of the team that turned the business around.

78. From 2008-2012, GSPAIL saw flat revenues and little growth.  (Exhibit N shall be provided in camera to the Court in camera.)

79. From March 2013-2019, GSPAIL prospered, with continuous growth in cases signed and revenue.  The growth was substantial and continuous.  (Exhibit N)

80. GSPAIL went from a modest-sized law firm to a large one, quickly between the time I joined and the time I departed.  (Exhibit N).

81. GSPAIL gained substantial revenue by growing instead of maintaining their marketing and operations used in 2008-2012. (Exhibit N)

82. After I joined GSPAIL, it transformed from low profits and low growth to high growth in revenue and cases signed.

83. GSPAIL went from relying on old marketing strategies (like Yellow Pages) to succeeding in signing cases from internet marketing.

84. GSPAIL's signed cases grew by over 400%, revenue grew by over 400%, creative production grew by over 5x.   (Exhibit N)

85. New technology and new processes were built up in GSPAIL during my tenure like never before.

86. Intake went from a few people answering phones to a bustling call center.

10

87. Calls went from little supervision to me being notified automatically if any call was missed.

88. GSPAIL went from not consistently advertising on Fridays or the weekends to figuring out how to make those times profitable to advertise.

89. The Greenville market had not responded to GSPAIL in the past. With new advertising in place, now it is among their largest markets. Prior to 2013, the GSPAIL consensus was that Greenville was too conservative.

90. I hired new advertising agencies, new web marketing groups and new internal staff to take GSPAIL to the next level. It worked.

91. The primary media buyer for GSPAIL was recruited by me; he wasn't even a media buyer before I asked him to consider auditing our media and buying for us.

92. The primary internet marketing resources and strategies were determined by me (with lots of input from industry experts and our own consultants) from 2013 onward. What I did worked.

93. The number of Auto and Workers' Compensation cases signed went from under 200 to over 300, then over 400, then over 500, and on and on. By the time I left, there were over 760 cases signed per month.

94. These increases happened in part because GSPAIL lacked the systems to do proper marketing and tracking at scale prior to 2013 and my joining the firm. I want to be clear that not all of the improvements in marketing are to my credit alone: it took a great team, a leader willing to invest a lot of money and a lot of great clients calling in to make this happen, but the long-desired increases did come after I joined GSPAIL.

95. I had duties in marketing for GSPAIL up until my separation from the firm. Even in the days just prior to my being ousted from GSPAIL, the firm had me spending all day on the phone, fielding calls from reporters for the LA Times and other publications, a job which said to be critical, but which no one else would do.

## PLAINTIFF'S MISCHARACTERIZATIONS

96. Plaintiff clams that Defendants are advertising on television in Greenville, SC. This is demonstrably false. I did not run a television advertisement in Greenville as GSPAIL claims I did.    (Exhibit R)

97. It appears that GSPAIL and its agents ran that television commercial themselves. They placed the media buy through their national advertiser for a low amount and through an unusual process. (Exhibit R)

11

98. GSPAIL knew or should have known their claim of me running this TV spot was false. Prior to making their claim that I was running TV advertising, GSPAIL had every opportunity I had to investigate this claim and verify it. (Exhibit R)

99. Plaintiff claims their rankings in Google have been harmed by the existence of Defendants and that all of their 600+ reviews have disappeared. I believe this is not accurate. GSPAIL's reviews still seem to be available on Google. (Exhibit S)

100. Rather than GSPAIL being hurt in Google, they seemed to have been helped. Based on my background with internet marketing and GPSAIL, I'd say that press coverage of the firm, initiated by their lawsuit, has likely done a lot to help the GSPAIL's rankings in Google, since Google tends to rank websites higher when they're mentioned in the news.

101. On the other hand, my own "Google My Business" listings (simple telephone-directory-style listings on Google) have been flagged many times for suspension by others. This is very unusual and I do not believe my phone number and address would be removed from Google's listings without GSPAIL's actions. Google keeps approving my listings and then they get flagged for suspension again, hiding my physical address and at least one of my listings.

102. GSPAIL tries to play the victim in public, but is actually an aggressor, in my view.

103. Plaintiff claims that the simple addition of my picture to my website constitutes "updated their website …with new information" and that this, combined with the other actions mentioned in their motion for a restraining order, are a sign of "imminent irreparable harm" which must be stopped by the Court. (See Plaintiff's memorandum in support of their TRO)

104. Adding my picture to my website helps people to know they're calling me, when they dial my number. If Plaintiff were acting for the public good, I believe they would welcome having my picture on the website.

105. It is easy to tell from my picture that I am not a 76-year-old man.

106. I believe I can be favorably compared with my father as an attorney, in at least some respects:
    a. I have worked cases from start to successful resolution for clients within the past 6 years as the only attorney on the case; whereas, he has not;
    b. I have been to court on behalf of a client within the past 6 years; whereas, he has not;
    c. I am licensed to practice law in Georgia; whereas, he is not; and,
    d. I am admitted to practice in the higher courts of Georgia; whereas, he is not

107. GSPAIL is not the listed owner of "George Sink, P.A. Injury Lawyers" alleged mark.
    a. Plaintiff claims they "the owner of U.S. Service Mark Registration No. 4,620,500 ("the '500 Registration");
    b. Plaintiff's name does not match the listed owner on the 500 Registration;
    c. At the same time, Plaintiff has asked the US Patent and Trademark Office to change the name of the registered owner to their name. Currently, a non-existent company is listed as the owner of the alleged mark. Plaintiff is not listed as the owner of the mark (Exhibit T); and,
    d. I believe Plaintiff has told the USPTO one thing and told this court something different.

108. Plaintiff is a national law firm, advertising and practicing nationally. Plaintiff practices in the areas of national mass torts, national veterans' benefits, national social security practice, national dangerous drug litigation, national medical device litigation, Auto Wrecks and Workers' Compensation. Plaintiff has cases in other states. (Exhibit U)

109. I believe it is not factually accurate to suggest GSPAIL is only a South Carolina and Georgia law firm. (Exhibit U.)

110. GSPAIL and my father are not well-known across the country, from my experience in marketing the firm as well as when traveling with my father and seeing the complete lack of reaction to our names or images in most of the country.

111. Plaintiff and Defendants have different practice areas.

112. Plaintiff practices in the areas of national mass torts, national veterans' benefits, national social security practice, national dangerous drug litigation, national medical device litigation, Auto Wrecks and Workers' Compensation.

113. Defendants practice in the areas of auto wrecks and some limited products liability, but also have a number of differing practice areas. Some of these differing practice areas include UCC9 claims, Bill Reduction/Debt Relief services, Construction Defects, False Advertising claims, and I am considering helping in cases with some limited intellectual property work, limited domestic relations work, non-auto insurance claims, etc.

114. GSPAIL (George Sink P.A. Injury Lawyers) focuses on injury claims, as their name suggests. Part of the reason that there's a George Sink II Law Firm, LLC is that it connotes a broader range of practice areas.

115. GSPAIL and Defendants have different client bases. According to Plaintiff's own motions, Plaintiff serves "people and families of modest incomes." Defendants are happy to provide services to people of all incomes as well as providing legal services to groups, organizations, companies, agencies, etc. (See Exhibit T).

116. Plaintiff knows that I represented clients on behalf of GSPAIL starting in 2016 (not 2018 as they falsely claimed), with one of my first clients having such an extraordinarily good result that GSPAIL filmed them for a testimonial. (Exhibit V)

117. As an attorney, I have an ethical obligation to communicate with my clients and inform former clients of their options, in the event of a departure from a law firm.

118. Plaintiff has refused to give out my contact information to people who call in for it (See Exhibit W)

119. Plaintiff has refused to give me full contact information for prior clients, so I could ensure they were informed and meet my duties.

120. Plaintiff's complaint set off substantial press coverage which makes it clear to many that we are in separate firms.

121. GSPAIL receives around 2,000 calls per business day. Based on that, I estimate that GSPAIL has received over 140,000 calls since firing me, with thousands of additional emails.

122. In light of the massive amounts of communication GSPAIL receives, they cite very few claims of people being surprised about our separate law firms. The incidence rate for problems is statistically zero.

123. Many law firms incorporate similar names or the same name. (Exhibit X)

124. These firms have not been prevented from co-existing and thriving separately.

125. There are several other "Sink" Law Offices in areas where GSPAIL advertises (they advertise nationally). These have never led to any action or claims. (Exhibit X)

126. It is common for fathers and sons to have the same or similar names in the South. In my experience, it is not uncommon for these fathers and sons in similar professions to work in separate businesses without issue.

127. In contrast, my father and GSPAIL have been exceedingly aggressive toward me, saying they are "at war" with me. Their actions demonstrate this animus:
    a. Plaintiff continues to use my name and image in their own advertising; (Exhibit J and Y.)
    b. Plaintiff includes my name in PPC ads (Exhibit Y);
    c. Plaintiff uses their firm's phone number on lawyer directories featuring my name, image and accomplishments; and,
    d. Plaintiff refuses to give out my contact information when people call to request it. In sharp contrast, I do give out GSPAIL's contact information. (Exhibit W)

14

128. GSPAIL has a longstanding marketing strategy of attempting to build its brand by building on the intellectual property of other companies and brands. A few examples include:
    a. Google;
    b. Steve Jobs/Apple;
    c. Jaws;
    d. "Friends" TV show; and,
    e. James Bond/Mission Impossible. (Exhibit Z)

129. GSPAIL's longstanding marketing strategy makes their claims to representing the public interest in regards to intellectual property ring hollow in my ears.

130. I believe the Plaintiffs see my personal brand as another one they may appropriate and use for their own benefit.

131. After firing me and after bringing suit, GSPAIL used my name in the body of advertisements, showing a link to my "Trial Advocacy Champion" webpage on their site, but redirecting to their homepage. (Exhibit Y)

132. GSPAIL does not seem genuinely concerned about the potential for confusion when they believe it helps them.

133. GSPAIL actively seeks to benefit from my name and accomplishments – even after I was separated from the firm.

134. Please also see Exhibits A2 and A3 attached hereto.

135. That I make these true and accurate statements of my own free will, under the penalty of perjury, and that I am not under the influence of any medication, drugs, alcohol, or duress of any type.

FURTHERMORE, THE AFFIANT SAYETH NOT.

SIGNATURE: _____
George T. Sink, Jr.

SWORN TO AND SUBSCRIBED    )
Before me this 29th day    )
of May 2019    )
    )
_____    )
NOTARY PUBLIC    )
STATE OF SOUTH CAROLINA    )
My commission expires: _____    )

LISA M. LESCORD
Notary Public-State of South Carolina
My Commission Expires
August 13, 2025

15