# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | | |
|---|---|---|
| GEORGE SINK, P.A. INJURY LAWYERS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 2:19-cv-01206 |
| GEORGE SINK II LAW FIRM LLC, | ) | **ORDER** |
| GEORGE SINK LAW FIRM LLC, | ) | |
| SOUTHERN LEGAL ASSOCIATION LLC, | ) | |
| and GEORGE ("TED") SINK, JR., | ) ) | |
| Defendants. | ) ) | |

This matter is before the court on plaintiff George Sink P.A. Injury Lawyers'

("plaintiff" or "Sink P.A.") motion to seal, ECF No. 16, and motion for preliminary

injunction, ECF No. 14; and on defendants George Sink II Law Firm, LLC, George Sink

Law Firm, LLC, Southern Legal Association, LLC ("SLA"), and George ("Ted") Sink,

Jr.'s [1] (collectively, "defendants") motions to dismiss, ECF Nos. 11 and 26. For the

reasons set forth below, the court grants the motion to seal, denies the motion to dismiss,

and grants the motion for preliminary injunction.

## I.  BACKGROUND

This matter arises from a dispute between George Sink Sr. and his son, George

Sink Jr.  According to the complaint, George Sink Sr. started Sink P.A. in 1997, since

which time he has used "GEORGE SINK-formative marks in connection with legal

---

[1] Plaintiff consistently refers to George Sink Jr. as "Ted," which is a nickname derived
from his middle name Theodore that he has allegedly been known by for most of his life.
The court leaves this moniker in the case title to reflect the case as plaintiff filed it but
chooses to address this defendant by his birth name, as requested by defendants.

services." ECF No. 17 ¶ 10. Plaintiff has expanded into 14 offices throughout South Carolina and Georgia. The firm advertises heavily on television, radio, billboards, mail, online, and through its website, www.sinklaw.com. Plaintiff owns U.S. Service Mark registration No. 3,849,776 ("the '776 registration" or "the '776 mark") for the GEORGE SINK, P.A. INJURY LAWYERS and design mark, which was issued on September 10, 2010 after the mark was allegedly first used in commerce as early as February 18, 1999. Plaintiff also owns U.S. Service Mark Registration No. 4,620,500 ("the '500 registration" or "the '500 mark") for the GEORGE SINK, P.A. INJURY LAWYERS mark, which was issued on October 14, 2014 and was allegedly used in commerce as early as February 18, 1999. Plaintiff alleges that these marks are associated with the firm's legal services and have acquired distinctiveness by having a secondary meaning to consumers. Plaintiff also claims that it has acquired common law rights in the GEORGE SINK marks, and that it has "expended significant resources in advertising and promoting its legal services" under these marks. Id. ¶ 22.

Plaintiff alleges that in March 2013, George Sink Jr.—who had previously worked in marketing in New York City for ten years—moved to Charleston to perform marketing work for plaintiff. George Sink Jr. then attended Charleston School of Law and graduated in 2016. In March 2018, George Sink Jr. transitioned from plaintiff's marketing team to work as an entry-level attorney at the firm. On April 30, 2018, George Sink Jr. signed a Confidentially and Non-Solicitation Agreement ("the Agreement") with Sink P.A..[2] The "circumstances surrounding entry into and the actual terms of [the

---

[2] Plaintiff has not attached the Agreement to its amended complaint, but defendants have attached it to their motion to dismiss. ECF No. 11-1. While the court does not ordinarily

2

Agreement] are set out by the Plaintiff's Amended Demand for Arbitration dated May 3, 2019." Id. ¶ 31. George Sink Jr.'s employment with plaintiff was terminated on February 7, 2019. According to plaintiff, George Sink Jr. formed SLA on February 11, 2019 for the purposes of managing two other corporations, named Sink II and Sink III, that he also formed in February 2019.

Plaintiff alleges that defendants "have been using in commerce the designations GEORGE SINK and GEORGE SINK II in connection with" the offering and marketing "of identical legal services in the same geographical regions as plaintiff." Id. ¶ 34. Plaintiff claims that these uses violates its exclusive right to use its protected mark. Plaintiff alleges various instances of confusion among the public from defendants' use of plaintiff's marks.

Plaintiff filed this lawsuit on April 25, 2019, and filed an amended complaint on May 21, 2019, bringing the following claims: (1) trademark infringement in violation of 15 U.S.C. § 1114; (2) unfair competition in violation of 15 U.S.C. § 1125(a); (3) cybersquatting in violation of 15 U.S.C. § 1125(d); (4) common law trademark infringement; (5) unfair trade practices in violation of S.C. Code § 39-5-20 et seq.; and (6) dilution in violation of S.C. Code § 39-15-1165. ECF No. 17. On May 21, 2019, plaintiff also filed a motion requesting permission to file under seal the Amended Demand for Arbitration filed by plaintiff against George Sink Jr. pursuant to the

_____

rely on evidence or facts outside of the complaint on a motion to dismiss, if a complaint incorporates an important document by reference, then the court may consider that document when submitted by defendants with a motion to dismiss. Here, the court finds that the complaint incorporates by reference the Agreement and finds that it is the central document to the current dispute.

arbitration clause of the Agreement.  ECF No. 16.  On June 7, 2019, defendants filed a motion to dismiss for failure to state a claim.  ECF No. 26.[3]  On June 21, 2019, plaintiff filed its response, ECF No. 34, and on June 27, 2019, defendants filed their reply, ECF No. 34.  On May 15, 2019, plaintiff filed a motion for preliminary injunction, ECF No. 14, to which defendants responded on May 29, 2019, ECF No. 20, and to which plaintiff replied on June 5, 2019, ECF No. 24.

## II.  STANDARDS

### A.  Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted."  When considering a Rule 12(b)(6) motion to dismiss, the court must accept the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor.  See E.I. du Pont de Nemours & Co. v. Kolon Indus., 637 F.3d 435, 440 (4th Cir. 2011).  But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  On a motion to dismiss, the court's task is limited to determining whether the complaint states a "plausible claim for relief."  Id. at 679.  Although Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," "a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The "complaint must contain sufficient factual matter, accepted as true, to

---

[3] Defendants motion to dismiss, ECF No. 26, does not raise any new issues but merely incorporates the arguments from their first motion to dismiss, ECF No. 11, which was rendered moot by the subsequent filing of an amended complaint.  As such, all of the court's references to the motion to dismiss will be to this original motion, ECF No. 11.

'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). "Facts pled that are 'merely consistent with' liability are not sufficient." A Soc'y Without a Name v. Va., 655 F.3d 342, 346 (4th Cir. 2011) (quoting Iqbal, 556 U.S. at 678).

### B. Preliminary Injunction

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." United States v. South Carolina, 840 F. Supp. 2d 898, 914 (D.S.C. 2011) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). As the Supreme Court has noted, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Id. at 22.

### III.  DISCUSSION

### A.  Motion to Dismiss

A brief discussion of the Agreement is required before addressing defendants' motion to dismiss. The Agreement contains an arbitration clause, under which the parties agreed that "any controversy arising under, or relating to, this Agreement will be subjected to binding arbitration pursuant to the South Carolina Uniform Arbitration Act [ ] in the County of Charleston, State of South Carolina." ECF No. 11-1 at 3. The clause mandates that the arbitration "shall be conducted on a confidential basis," hence the

5

pending motion to seal.  Despite the requirement that all disputes between the parties be handled in arbitration, the clause contains the following exclusion: "[t]he Arbitrator shall be fully empowered to enter injunctive relief, and the parties may seek and obtain a temporary restraining order or injunction from a court while awaiting the decision of the Arbitrator on a claim for a restraining order or injunction."  Id.  Plaintiff filed suit pursuant to this exclusion.  ECF No. 17 ¶ 54.

Defendants' motion to dismiss appears to articulate two distinct bases upon which the court should dismiss the complaint.  First, defendants argue that the complaint seeks relief from this court beyond what is permitted by the arbitration clause and that the entire complaint should thus be dismissed.  As discussed in the above paragraph, the arbitration clause allows either party to seek a temporary restraining order or injunction from the court while awaiting the Arbitrator's final decision.  Defendants' arguments on this ground were put forth in their original motion to dismiss, ECF No. 11, which was filed before plaintiff filed the amended complaint, ECF No. 17.  Defendants were correct that the original complaint—in seeking damages and permanent injunctive relief—went beyond the scope of relief allowed by the arbitration clause.  However, the amended complaint seeks only temporary injunctive relief.  Defendants' new motion to dismiss did not add anything to its original motion to dismiss, but rather incorporated wholly the arguments made in that first motion; thus, the current motion to dismiss does not account for the new complaint, which does not seek relief beyond what is allowed by the arbitration clause.  While the amended complaint does allege that plaintiff has been damaged by defendants' infringing behavior, it does not request monetary damages.  Furthermore, the only injunctive relief that plaintiff requests is "injunctive relief pursuant

to the Arbitration Clause." ECF No. 17 ¶ 54. Plaintiff's prayer for relief only asks that the court preliminarily enjoin defendants from using plaintiff's marks.

Defendants next argue that the court should dismiss the complaint because the arbitration clause provides that "[t]he Employer may only recover up to $500.00, including all costs and fees for all claims, as a total sum, against Employee, agreeing that this represents full and final payment for all claims against Employee now and in the future." ECF No. 11-1 at 3. Defendants claim to have tendered the $500.00 to plaintiff pursuant to this clause on March 8, 2019. Defendants argue that this clause precludes plaintiff from seeking any injunctive relief now that the $500.00 has been tendered, interpreting the above-quoted section of the arbitration clause to mean that literally the only relief Employer can get from employee is $500.00. The court disagrees and finds that this is an inaccurate interpretation of the arbitration clause. When reading the clause in totality, it is clear to the court that this $500.00 provision exists merely to limit the amount of money damages that the Employer can receive. There is nothing in this sentence to indicate that $500.00 is the exclusive remedy or that the Employer may not seek injunctive relief in addition to this $500.00. To the contrary, just a few sentences above this $500.00 provision, the arbitration clause clearly states that the Arbitrator may enter injunctive relief and that the parties may seek temporary injunctive relief from a court while awaiting the Arbitrator's decision. Thus, the court denies the motion to dismiss on this ground.

Finally, defendants raise an issue that is ultimately irrelevant to the current motions. Defendants' motion to dismiss posits that "[i]t is foreseeable that the Plaintiff may argue that dismissal is not proper because its Demand for Arbitration alleges that the

Non-Solicitation Agreement was the product of fraud" but that plaintiff "has waived its ability to advance any such argument." ECF No. 11 at 5. Yet in the action before this court, plaintiff's response to the motion to dismiss does not argue that the motion should not be dismissed due to any issues with the Agreement. Rather, plaintiffs' response to defendants' two main arguments in favor of dismissal address the merits of those arguments directly. Nonetheless, defendants have argued that "[i]t is impossible that the plaintiff can advance in arbitration that the [ ] Agreement is the product of fraud and in this action invoke the power and authority of the same Agreement as justification for its complaint." ECF No. 11 at 6. To the extent that defendants are actually asking the court to dismiss the complaint by arguing that plaintiff is estopped from bringing this suit because plaintiff has sought in arbitration to have the Agreement declared invalid, the court rejects this argument. Defendant improperly categorizes its "estoppel" argument. Plaintiff's attempt to reform, through the arbitration process, parts of the Agreement that it contends are invalid does not preclude plaintiff from seeking temporary relief from this court pursuant to the Agreement while it is awaiting the Arbitrator's decision.

For all of the reasons set forth above, the court denies the motion to dismiss.

**B. Motion for Preliminary Injunction**

Plaintiff next asks the court to issue a preliminary injunction ordering the following relief:

> prohibit [d]efendants from using the designations GEORGE SINK or GEORGE SINK II, or any other similar GEORGE SINK-formative designation; remove GEORGE SINK-formative references, including the email address georgesink@gmail.com and website <georgesinklawfirm.com>, from all profiles, including the State Bar directories and social media accounts; and whatever other relief the Court deems just and equitable.

8

ECF No. 14 at 29.

A party seeking a preliminary injunction must demonstrate that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in absence of the injunction, (3) the balance of hardships tips in its favor, and (4) the injunction is in the public interest. Metro. Reg'l Info. Sys. v. Am. Home Realty Network, Inc., 722 F.3d 591, 595 (4th Cir. 2013) (citing Winter, 555 U.S. at 20). "To obtain a preliminary injunction under the Winter test, a movant must make a 'clear showing' of [the] four requirements." Alkebulanyahh v. Nettles, 2011 WL 2728453, at *3 (D.S.C. July 13, 2011); see also Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011) ("Winter thus requires that a party seeking a preliminary injunction . . . must clearly show that it is likely to succeed on the merits." (internal quotation omitted)).

Plaintiff is seeking a prohibitory injunction to maintain the status quo until its disputes with defendants are resolved through arbitration. "Prohibitory preliminary injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." Pashby v. Delia, 709 F.3d 307, 319 (4th Cir. 2013). The Fourth Circuit has defined "status quo" in this context as "the last uncontested status between the parties which preceded the controversy." Id. at 320. "To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but . . . [s]uch an injunction restores, rather than disturbs, the status quo ante." Aggarao v. MOL Ship Mgmt. Co., 675 F.3d 355, 378 (4th Cir. 2012) (internal quotation marks and citation omitted); see also League of Women Voters of N. Carolina v. North Carolina, 769 F.3d 224, 236 (4th Cir. 2014) (finding that a motion to enjoin a

9

law's "elimination of [same-day registration], out-of-precinct provisional voting, [ ] preregistration[, and] its cutback of early voting" was "the language and stuff of a prohibitory injunction seeking to maintain the status quo").  Plaintiff contends that the "last uncontested status" between it and defendants was just before defendants allegedly began using the GEORGE SINK mark in an allegedly infringing manner.  Thus, plaintiff's motion for preliminary injunction seeks to restore the status quo by enjoining defendants from any infringing use of plaintiff's protected mark until the Arbitrator issues a final decision.  The court will grant such relief.

### 1.    Likelihood of Success on Merits

For a preliminary injunction to issue, plaintiff must first make a clear showing that it is likely to succeed on the merits.  See Winter, 555 U.S. at 20.  "Although [the likelihood-of-success] inquiry requires plaintiffs . . . to make a clear showing that they are likely to succeed at trial, plaintiffs need not show a certainty of success."  Pashby, 709 F.3d. at 321 (internal citations omitted).   To succeed in a trademark infringement action under the Lanham Act, a plaintiff must establish:

> (1) that it owns a valid mark; (2) that the defendant used the mark in commerce and without plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it) in connection with the sale, offering for sale, distribution, or advertising of goods or services; and (4) that the defendant's use of the mark is likely to confuse customers.

Rosetta Stone, Ltd. v. Google, Inc., 676 F.3d 144, 152 (4th Cir. 2012); see also 15 U.S.C. § 1114(1)(a); Scurmont LLC v. Firehouse Rest. Grp., Inc., 2010 WL 11433199, at *7 (D.S.C. May 19, 2010) ("[T]he elements of common law unfair competition and trademark infringement under South Carolina law are identical to the elements for proving a Lanham Act claim.").  The court addresses each element in turn.

### a. Valid Trademark

Plaintiff bases its motion on the two federal registrations it owns for the GEORGE SINK marks, as well as upon its common law trademark rights in the marks.

Generally, "the party claiming ownership of a mark must be the first to use the mark in the sale of goods. The party claiming ownership must also use the mark as a trademark, that is, the mark must be used to identify the source of the goods to potential customers." George & Co., LLC v. Imagination Entm't Ltd., 575 F.3d 383, 400 (4th Cir. 2009) (internal citation omitted). As long as the party claiming ownership of a mark "is the first to use a particular mark to identify his goods in a given market, and so long as that owner continues to make use of the mark, he is 'entitled to prevent others from using the mark to describe their own goods' in that market." Id. (quoting Defiance Button Mach. Co. v. C & C Metal Prods. Corp., 759 F.2d 1053, 1059 (2d Cir. 1985)).

If the U.S. Patent and Trademark Office ("USPTO") issues a registration for a mark that has been registered on the principal register, then this registration "shall be prima facie evidence of the validity of the registered mark, . . . of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration. . . ." 15 U.S.C. § 1115(a). "Registration grants a presumption of ownership, dating ownership to the filing date of the federal registration application, and the party challenging the registrant's ownership must overcome this presumption by a preponderance of the evidence." George & Co., 575 F.3d at 400 n.15. Plaintiff has presented evidence that it has two federal registered trademarks—the '776 mark and the '500 mark—and thus has proven to the court that it has a valid, protectable mark.

Defendants' response to the motion for preliminary injunction raises the following objections to the validity of plaintiff's ownership of the GEORGE SINK marks: (1) the '776 mark is for a particular design and thus cannot prevent defendants from using the words "George Sink" in connection with legal services if they do not copy the design; (2) the '500 mark, although not a trademark for a design, is invalid because it was issued in the name of "George Sink P.A." instead of "George Sink P.A. Injury Lawyers"; and (3) plaintiff cannot own George Sink Jr.'s name.

First, regarding the '776 mark, defendants argue that plaintiff is only entitled to protection for the specific design plus words combination that is portrayed in the mark's Registration Certificate. Defendants argue that because they have not copied plaintiff's design, then plaintiff cannot rely on its registered mark to now claim that the name "George Sink" in combination with the offer of legal services should be entitled to trademark protection. Defendants contend that this registration is "very specific: it is for what is known as a design plus words, letters, and/or numbers." ECF No. 20 at 7. The Certificate for the '776 mark from the USPTO does in fact demonstrate that the protection is specifically for the design mark. ECF No. 17-1 at 2. The Certificate provides that "the mark consists of the word 'George' above the words 'Sink, P.A.', which is above the words 'injury lawyers', in all capital letters, between two horizontal lines that are situated above and below the words 'injury lawyers.'" Id. At the hearing on this matter, plaintiff argued that even though the '776 mark is partly a design mark, the dominant feature of the mark is GEORGE SINK, and as such the '776 design still provides protection. While the court will discuss the dominant feature theory later in this order, it finds that it need not determine at this stage the scope of protection offered by

the '776 mark, because the '500 mark provides sufficient protection for the purposes of this preliminary injunction.

In contrast to the '776 mark, the '500 mark has created protection for the words "GEORGE SINK, P.A. INJURY LAWYERS," without any reference to a particular arrangement or design of the words. ECF No. 17-2. This Registration Certificate categorizes the mark as a Service Mark for "legal services, namely, providing customized legal information, counseling, advice, and litigation services in all areas of law to people and families of modest incomes, in class 45." Id. Additionally, "the mark consists of standard characters without claim to any particular font, style, size, or color." Id. Finally, the Certificate provides that "no claim is made to the exclusive right to use 'P.A.' and 'INJURY LAWYERS', apart from the mark as shown." Id.

Defendants attempt to undermine the validity of plaintiff's '500 registration by arguing that plaintiff does not own this trademark because the application for the '500 mark listed "George Sink P.A." as the owner, resulting in the Registration Certificate listing "GEORGE SINK P.A.' as the owner, when in fact there is no legal entity named "George Sink P.A." ECF No. 20 at 9. In other words, because the certificate was not issued to "George Sink, P.A. Injury Lawyers," defendants argue that plaintiff—whose full legal title is George Sink, P.A. Injury Lawyers and not merely George Sink P.A.— does not actually own the mark. The court agrees with plaintiff that the omission of "Injury Lawyers" was a typographical error. It is obvious that "George Sink, P.A." is the "same entity as plaintiff from the face of the '500 Registration, which shows: the applicant's address is the same as Plaintiff, the submitted specimen shows Plaintiff's website, the '500 Registration claims ownership of the '776 Registration, and the applied

for mark is GEORGE SINK P.A. INJURY LAWYERS." ECF No. 24 at 6. On April 25, 2019, plaintiff filed a request to correct the name, and on May 22, 2019, the USPTO issued a Certificate of Correction. See 37 C.F.R. § 2.71(d) ("The applicant may amend the application to correct the name of the applicant, if there is a mistake in the manner in which the name of the applicant is set out in the application.").

Defendants have also argued that they are not infringing upon plaintiff's mark because the mark is for GEORGE SINK P.A. INJURY LAWYERS, and defendants are only using George Sink Jr.'s given name and are not using GEORGE SINK P.A. INJURY LAWYERS at all. Yet as the Fourth Circuit has reasoned, "the marks need only be sufficiently similar in appearance, with greater weight given to the dominant or salient portions of the marks." Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 936 (4th Cir. 1995). In Lone Star, the court had to consider whether a restaurant named LONE STAR GRILL was infringing upon the plaintiff's exclusive right to use the marks LONE STAR CAFÉ and LONE STAR STEAKHOUSE & SALOON. The Fourth Circuit ultimately affirmed the district court's grant of summary judgment upon finding actual confusion among consumers. In doing so, the court noted that even though LONE STAR GRILL did not directly copy the entirety of the LONE STAR STEAKHOUSE & SALOON mark, "the dominant portion of the parties' marks—'Lone Star'—is the same, causing a strong likelihood of confusion." Id. at 936 (emphasis added). The defendant's "advertisements also show[ed] 'Lone Star' in larger lettering than the word 'Grill,' further reinforcing the dominance of the mark 'Lone Star.'" Id.

The court finds the Fourth Circuit's reasoning in Lone Star to be applicable here. Defendants' use of GEORGE SINK without "P.A." or "Injury Lawyers" does not itself

14

save them from allegations of infringement, since the dominant portion of the '500 mark is clearly the name GEORGE SINK. In fact, the '500 registration specifically disclaims any exclusive right to use P.A. and INJURY LAWYER, emphasizing the centrality of GEORGE SINK in the mark. This is further demonstrated by the evidence plaintiff put forth of its extensive advertising efforts which emphasizes the GEORGE SINK name when advertising the services of George Sink P.A. Injury Lawyers. Furthermore, in the logos that each party uses on their respective law firm websites, the name GEORGE SINK is more prominent than the auxiliary words.

Finally, defendants argue that plaintiff "cannot own defendant George Sink, Jr.'s name." ECF No. 20 at 10. The presumption of the mark's validity that results from a mark's registration with the USPTO "shall not preclude another person from proving any legal or equitable defense or defect, including those set forth in subsection (b), which might have been asserted if such mark had not been registered." 15 U.S.C. § 1115(b). The only defense in § 1115(b)'s list that defendants has raised is that "the use of the name . . . charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business . . . ." 15 U.S.C. § 1115(b)(4). ECF No. 20 at 10. Yet as plaintiff argues in it reply, "[a] junior user's right to use his name thus must yield to the extent its exercise causes confusion with the senior user's mark." Basile, S.p.A. v. Basile, 899 F.2d 35, 39 (D.C. Cir. 1990); see also Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 125–26 (4th Cir. 1990) (". . . there can be little doubt that Perini Corp. has established secondary meaning in the name Perini. . . . But the plaintiff has the burden to show secondary meaning (1) in the defendant's trade area and (2) prior to the time when the defendant entered the market."); Suisman, Shapiro, Wool, Brennan, Gray, &

Greenberg, P.C. v. Suisman, 2006 WL 387289, at *12 (D. Conn. Feb. 15, 2006) (finding that "the law does not generally afford the defendants an unlimited right to use their own surnames in business in the circumstances of the case" and that the defendant law firm did not have a "particular 'right' to call themselves 'Suisman & Shapiro' stemming from the common custom of naming law firms after their members"); McCarthy, Trademarks and Unfair Competition, § 13:17, 13–31 ("If a person whose surname has been legally adopted by a senior user, then severs his ties with that company and goes into business for himself, he has no unqualified right to use his own name, if the result is likelihood of confusion."). Thus, if defendants' use of the GEORGE SINK mark otherwise meets the Rosetta Stone requirements for infringement, the mere fact that it is George Sink Jr.'s given name does not automatically shield him from allegations of infringement.

Having determined that the '500 mark is a valid trademark that protects plaintiff's exclusive use of the GEORGE SINK P.A. INJURY LAWYERS mark, the court need not at this stage delve into plaintiff's alleged common law rights in the GEORGE SINK mark.

### b.  Used in Commerce Without Consent

Plaintiff must next demonstrate that defendants used the mark in commerce without plaintiff's consent. See Rosetta Stone, 676 F.3d at 152. Section 1127 provides that, "unless the contrary is plainly apparent from the context[,] . . . [t]he word 'commerce' means all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. Accordingly, "commerce" under the Lanham Act "is coterminous with that commerce that Congress may regulate under the Commerce Clause." Int'l Bancorp, LLC v. Societe des Bains Mer et du Cercle des Estangers a Monaco, 329 F.3d 359, 364

16

(4th Cir. 2003); see also U.S. Const. art. I, § 8, cl. 3 (providing, in relevant part, that "[t]he Congress shall have Power . . . to regulate Commerce with foreign nations, and among the several States"). Section 1127 defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not merely to reserve a right in a mark." 15 U.S.C. § 1127. A mark on goods is deemed to be used in commerce when (1) the mark "is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale"; and (2) "the goods are sold or transported in commerce." Id. With regard to services, a mark is in use in commerce when the mark "is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States . . . and the person rendering the services is engaged in commerce in connection with the services." Id.

Here, there is no dispute that the GEORGE SINK mark is being used in commerce, as defendants are using the mark in connection with their advertisement and provision of legal services. It is also undisputed that plaintiff has not consented to defendants using the mark in this way.

### c. Used in Offering for Sale or Advertising of Goods / Services

As just mentioned, the court finds that defendants "used the mark (or an imitation of it) 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services." Rosetta Stone, 676 F.3d at 152. The court finds that plaintiff has made a clear showing that defendants have used the dominant portion of the '500 mark in connection with the advertising and offering of legal services. See id.

### d. Likelihood of Confusion

"A likelihood of confusion exists 'if the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question.'" George & Co., 575 F.3d at 393 (quoting CareFirst of Md., Inc v. First Care, P.C., 434 F.3d 263, 267 (4th Cir. 2006)). "The ultimate question, for purposes of determining liability in trademark infringement actions, is whether there exists a likelihood that an appreciable number of ordinarily prudent purchasers will be misled, or indeed simply confused, as to the source of the goods in question." Perini, 915 F.2d at 127 (emphasis added) (internal quotations omitted). Consumer confusion can by found "by presumption based upon intentional copying." Augusta Nat., Inc. v. Exec. Golf Mgmt., Inc., 996 F. Supp. 492, 497 (D.S.C. 1998) (citing Osem Food Industries, Ltd. v. Sherwood Foods, Inc., 917 F.2d 161, 165 n.8 (4th Cir. 1990)). Alternatively, the Fourth Circuit has put forth the following nine factors for courts to consider in determining whether there is a likelihood of confusion:

> (1) the strength and distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

Rosetta Stone, 676 F.3d at 153. "Not all of these factors are of equal importance, 'nor are they always relevant in any given case.'" George & Co., 575 F.3d at 393 (quoting Anhueser-Busch, Inc. v. L&L Wings, Inc., 962 F.2d 316, 320 (4th Cir. 1992)); see also Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 804 (4th Cir. 2001) ("The importance and relevance of each factor will, of course, vary from case to case.").

### i. Strength of the Mark

"The strength of a mark is the degree to which a consumer in the relevant population, upon encountering the mark, would associate the mark with a unique source." First Care, 434 F.3d at 269. "The 'strength' of the trademark is evaluated in terms of its conceptual strength and commercial strength." Id. Courts should assess the conceptual "or inherent" strength of a mark by focusing on its "linguistic or graphical 'peculiarity' [ ] considered in relation to the product, service, or collective organization to which the mark attaches." Id. (citing Perini, 915 F.2d at 124). "[T]he frequency of prior use of [a mark's text] in other marks, particularly in the same field of merchandise or service, illustrates the mark's lack of conceptual strength." Id. at 270 (internal quotes omitted). Here, the parties have not presented any other instances of the GEORGE SINK name or mark being used by third parties in relation to the provision of legal services. Thus, although the words used in the mark or their combination are not particularly "peculiar," the court finds that the mark is relatively conceptually strong.

In assessing commercial strength, a court "looks at the marketplace and asks if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." Id. (internal quotes omitted). "A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." Id. (quoting Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co., 22 F.3d 1527, 1533 (10th Cir. 1994)). A mark's commercial strength is a more important factor than its conceptual strength, "because a conceptually weak but commercially strong mark can still gain protection through secondary meaning, as

illustrated by such examples as AMERICAN Airlines, PAYLESS Drug Stores and KENTUCKY FRIED CHICKEN." Fuel Clothing Co. v. Nike, Inc., 7 F. Supp. 3d 594, 610 (D.S.C. 2014) (quoting Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc., 405 F. Supp. 2d 680, 691 (E.D. Va. 2005), aff'd, 227 F. App'x 239 (4th Cir. 2007)). "On the other hand, a conceptually strong mark that is relatively unknown in the marketplace will not be likely to cause any confusion among consumers of other products." Renaissance, 405 F. Supp. 2d at 691 (citing McCarthy on Trademarks § 11:83).

The Fourth Circuit has relied on the following factors when considering the commercial strength, or "secondary meaning," of a mark: "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." Perini, 915 F.2d at 125. Plaintiff has presented the court with confidential information from which the court has determined that plaintiff has expended a substantial sum of money on advertising for its services over the last thirteen years. The success of these advertising efforts is demonstrated by a 2018 survey conducted by an independent research and consulting firm. ECF No. 14-2 ¶ 53. This survey shows that most of the participants listed George Sink as the "attorney or law firms" that they could best recall. Id. at 52. George Sink was also ranked first by a wide margin in response to the question "[i]f you were involved in an accident, and needed a lawyer, which personal injury lawyer or law firm would you call first?" Id. Ex. F. There is also plenty of evidence of unsolicited media coverage of Sink P.A., including news articles, social media posts, and awards for Best Law Firm from The State newspaper.

Based on the foregoing, the court finds that plaintiff's mark has significant commercial strength.

### ii. Similarity of the Two Marks to Consumers

In determining whether marks are similar, courts "must examine the allegedly infringing use in the context in which it is seen by the ordinary customer." Id. (quoting Anheuser-Busch, Inc., 962 F.2d at 319). "In assessing the similarity of the marks . . . we focus on the dominant portions of the parties' marks." George & Co., 575 F.3d at 396. Here, the dominant portion of both parties' marks is the use of the name GEORGE SINK. In plaintiff's mark, the dominant GEORGE SINK wording is paired with generic descriptive wording: P.A. and INJURY LAWYERS. Defendants use the GEORGE SINK mark in several different ways. First, there is the name of George Sink Jr.'s law firm website: WWW.GEORGESINKLAWFIRM.COM. Here, defendants are using the dominant portion of plaintiff's mark—GEORGE SINK—with nothing to set it apart from plaintiff's mark other than the generic descriptive words LAW FIRM. The email address listed on George Sink Jr.'s professional website is GEORGESINK@GMAIL.COM; in other words, defendants' professional email address is composed of the dominant portion of plaintiff's mark and nothing else. Right next to where George Sink Jr. has listed this email address is the text GEORGE SINK LAW FIRM without any additional text to distinguish from plaintiff's mark. George Sink Jr. has also listed this email address on his membership profile page for both the South Carolina Bar and State Bar of Georgia's websites. On the Georgia Bar's website, he has listed as his place of work GEORGE SINK LAW FIRM.

"If one of two similar marks is commonly paired with other material, that pairing

will serve to lessen any confusion that might otherwise be caused by the textual similarity between the two marks." CareFirst, 434 F.3d at 271. In considering the similarity of competing marks in CareFirst, the Fourth Circuit noted that the effect on confusion between the two marks that was created by the marks being paired with other material is "most significant when . . . the allegedly infringed mark . . . has little independent strength." Id. The court found that "[b]ecause CareFirst's registered mark is weak, consumers encountering 'CareFirst BlueCross BlueShield,' on the one hand, and 'First Care,' on the other, are more likely to focus on the differences between the two, particularly when the most salient difference—the addition of 'BlueCross BlueShield'— is itself a prominent mark." Id. By contrast, the two competing uses of the GEORGE SINK name in the case currently before this court are not paired with sufficiently distinguishing material. As discussed above, the dominant portion of plaintiff's mark— the GEORGE SINK name—has substantial independent strength. Thus, the presence of distinguishing material such as P.A. INJURY LAWYERS is not as salient. Furthermore, none of the additional text that accompanies both sides' use of the GEORGE SINK mark reaches anywhere near the prominence of "BlueCross BlueShield," which itself is a protected mark. Merely placing a "II" or generic language like "LAW FIRM" after a protected mark does not, without more, distinguish it enough to eliminate confusion when the original protected mark is so widely known among consumers. And having an email address that uses only the dominant portion of a protected mark without any distinguishing factors does not indicate to consumers that the holder of that email address is a different business entity than the business that owns the protected mark. Thus, the court finds that this factor weighs in favor of the court finding a likelihood of confusion.

### iii.   Similarity of Goods/Services Identified by the Marks

"[I]n assessing whether confusion exists, the court must 'look to how the two parties actually use their marks in the marketplace to determine whether the defendant's use is likely to cause confusion.'" <u>Fuel Clothing</u>, 7 F. Supp. 3d at 609 (quoting <u>CareFirst</u>, 434 F.3d at 267).   There is no dispute that both sides' marks identify legal services—specifically, legal representation for personal injury lawsuits.  Thus, this factor weighs in favor of plaintiff.

### iv.   Similarity of the Facilities Used by the Markholders

The evidence presented makes a clear showing that both parties use similar facilities.  Both parties practice the same type of law in Charleston, South Carolina and the surrounding area.  They both have websites that offer information about their practices, and they both advertise on social media.  The domain names for the parties are very similar.  And as plaintiff observed in its motion and during the hearing, "a Google search results shows that a consumer in Charleston searching for the phrase 'george sink' will get Google Business listings for both plaintiff and defendants right next to each other."  ECF No. 14 at 22.  Thus the court finds that this factor weighs in favor of plaintiff.

### v.   Similarity of Advertising Used by the Markholders

As discussed in the above section, the parties employ similar advertising strategies and target the exact same type of client.

### vi.   Defendants' Intent

"If there is intent to confuse the buying public, this is strong evidence establishing the likelihood of confusion, since one intending to profit from another's reputation

23

generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion." George & Co., LLC, 575 F.3d at 397 (quoting Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir. 1984)). The only direct evidence of defendants' intent that plaintiff has put forth is a declaration from Dr. Norman Wiedow, a family friend who claims to have attempted to "mediate" the dispute between George Sink Sr. and George Sink Jr. about whether Sr. would guarantee that Jr. would one day assume leadership of Sink P.A. Dr. Wiedow claims that during this process, George Sink Jr. told him that "if he did decide to take George [Sr.]'s offer, nobody better ever mess with him on this because his name was the same as George's name and that he could cause George a lot of trouble if he wanted to do that." ECF No. 14-23. The court does not consider this to be enough evidence at this stage from which to make a proper determination about the intent behind George Sink Jr.'s allegedly infringing use of plaintiff's mark.

### vii. Actual Confusion

The Fourth Circuit has held that "the seventh factor—actual confusion—is often paramount. When the plaintiff's mark is strong and the defendant's use of a similar mark has actually confused the public, our inquiry ends almost as soon as it begins." Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 804 (4th Cir. 2001) (internal quotes omitted). Plaintiff has put forth several instances of confusion that it claims supports this "actual confusion" prong. George Sink Sr. recounted the first instance of confusion in his declaration:

> On or around March 7, 2019, Sink, P.A. received lien information related to a client claim from Optum, regarding S.C., one of the few clients who chose to remain represented by Ted when he left Sink, P.A. Because the lien

24

> information was requested by Ted from the email address
> georgesink@gmail.com, the Optum analyst mistakenly sent the information
> to Sink, P.A. When Sink, P.A. explained that it was no longer representing
> S.C., the Optum analyst stated: "Are there two different law firms now for
> George Sink? I am confused." A copy of this email is attached hereto as
> Exhibit B.

ECF No. 14-2, Sink Decl. ¶ 19.  A review of these emails confirms that a former client

was confused about which Sink law firm she was dealing with.  The second incident, also

recounted by George Sink Sr., occurred as follows:

> From time to time, Sink, P.A. will receive calls from banks to verify checks
> issued by Sink, P.A. Banks routinely make such calls if they have concerns
> regarding the check, such as the accuracy of the amount, or the person
> attempting to cash or deposit the check. On May 10, 2019, Sink, P.A.
> received a call from a bank attempting to verify a check issued by Ted's law
> firm. A copy of the email from Sink, P.A.'s accounting department
> reporting the incident is attached hereto as Exhibit E. Prior to this, Sink,
> P.A. has never received a call from a bank to verify a check issued by
> another law firm.

Id. ¶ 22.  Exhibit E to George Sink Sr.'s declaration supports that Sink P.A. "received a

call to verify a check cut from GT's new law firm.  The check was not from our accounts

but the fact that they called our phone number makes me wonder if our firm's number is

written on the check or if the bank simply just called us out of habit."  Additional

evidence was presented at the hearing of a letter from defendants' law firm that was

addressed to George Sink Jr. yet had accidentally been addressed and mailed to Sink P.A.

While these instances clearly indicate confusion, they do not necessarily indicate

consumer confusion.  The confusion of a former client and a bank that had previously

worked with Sink P.A. is different to whether the average consumer would be confused

about which law firm it was dealing with.  Additionally, defendants contend that the

individual who incorrectly sent the letter to Sink P.A. got the address from a legal

directory that had not yet been updated to reflect that George Sink Jr. no longer worked at Sink P.A. Thus, defendants' argue, it was not an instance of a consumer confusion but of directory confusion. The court sees the merits of this argument. However, the court also agrees with the argument made by plaintiff's counsel at the hearing that the confusion among these sophisticated business entities can be indicative of the likelihood of confusion of the average consumer—particularly the types of consumers to whom the parties direct their advertising. Additionally, given the clear strength of plaintiff's mark, the similarity of the marks used by both parties, and the fact that the marks are being used in the same geographic area for the exact same services—if defendants do not adjust their marks to better distinguish their businesses from Sink, P.A., then it is very likely that consumer confusion will occur.

### viii. Quality of the Defendants' Product

Plaintiff's have not put forth evidence of this factor, contending that it is not relevant to the likelihood of confusion analysis in the case because "[c]onsideration of the quality of the defendant's product is most appropriate in situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods." Sara Lee, 81 F.3d at 467. Defendants have not offered anything on this prong either. Thus, the court does not consider whether this factor weighs in favor or against granting the preliminary injunction.

### ix. The Sophistication of the Consuming Public

Plaintiff alleged in its motion that this factor is not relevant because the market for both parties' legal services is the general public and buyer sophistication is only a relevant factor "when the relevant market is not the public-at-large." Id. However, at the

hearing, plaintiff's counsel argued that because the consumers to whom the parties direct their advertising and offers of service are primarily injured persons seeking to bring personal injury lawsuits, the court should find that this factor weighs in plaintiff's favor because those individuals do not have a sophisticated understanding of the practice of law.  The court is inclined to agree.  The court does not believe that the average person seeking representation for a personal injury matter is an unsophisticated individual.  Rather, the court finds that the average person seeking to hire Sink P.A. or George Sink Jr. to represent them in a personal injury suit may not have the requisite understanding of the legal system to be able to differentiate between the quality of service being offered by the two firms.  It is exactly this lack of discernment between the two firms that forms the bases of plaintiff's efforts to prevent allows defendants from capitalizing on the good will that plaintiff has built up in its mark over the last twenty years.  Plaintiff has spent nearly two decades and an exorbitant amount of money advertising for its legal services and building up awareness of and goodwill in its trademark, and it would not be just to allow defendants to unduly benefit from the goodwill in the GEORGE SINK mark at the potential expense of plaintiff.  George Sink Jr. is of course not barred from practicing law under his birth name, but in advertising for his legal services he must do more to differentiate between him and plaintiff.

Based on the foregoing analysis, the court finds that plaintiff has made a clear showing that he would likely succeed on the merits of his claim.  As such, this factor weighs in favor of granting preliminary injunctive relief until a final decision is issued by the Arbitrator.

## 2.     Irreparable Harm

To obtain a preliminary injunction, plaintiff must next make a clear showing that it will be irreparably harmed in the absence of preliminary injunctive relief.  See Winter, 555 U.S. at 20.  This standard requires more than the mere "possibility" of being irreparably harmed; rather, the plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction."  Id. at 21.  "In Lanham Act cases involving trademark infringement, a presumption of irreparable injury is generally applied once the plaintiff has demonstrated a likelihood of confusion, the key element in an infringement case."  Scotts Co. v. United Indus. Corp., 315 F.3d 264, 273 (4th Cir. 2002); see Lone Star, 43 F.3d at 939 ( recognizing that "regardless of any potential injury to sales or to the mark itself, trademark infringement primarily represents an injury to reputation").

At the hearing on this matter, defendants asked the court to follow the lead of two other cases which have recently removed the presumption of irreparable injury in the context of patent and copyright disputes.  Defendants urge the court to extend this reasoning to the trademark context.  Defendants' argument lacks the requisite legal and logical support.  Trademark harms are inherently different than harms that can be quantified and redressed later through monetary damages.  In Merry Maids Ltd. P'ship v. Kamara, 33 F. Supp. 2d 443, 445 (D. Md. 1998) (quoting Long John Silver's, Inc. v. Wash. Franchise, Inc., 1980 WL 30249, at *12 (E.D. Va. June 24, 1980)), the court concluded that the defendants' unauthorized use of the plaintiff's trademark gave rise to irreparable harm because the plaintiff "lost control of its business reputation," "a substantial likelihood of confusion of the purchasing public" was shown, "no meaningful monetary recovery [was] available," and "an inherent injury to the good will and

reputation of the plaintiff" resulted from the infringement. It is for this reason that "[a] finding of irreparable harm usually follows a finding of unlawful use of a trademark and a likelihood of confusion." Ledo Pizza Sys., Inc. v. Singh, 2013 WL 5604339, at *3 (D. Md. Oct. 10, 2013).

Thus, the court finds that plaintiff has made a clear showing that it will suffer irreparable harm in the absence of preliminary injunctive relief.

### 3. Balance of Equities

In considering the balance of the equities between the parties, traditionally the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the relief requested." Winter, 555 U.S. at 24 (quoting Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987)). The effect on defendants of granting the requested relief will not be too severe. George Sink Jr. will not be prevented from practicing law, but will merely need to clarify to the public that he is a separate business from Sink P.A. He will be required to change or temporarily remove his website, change or temporarily remove his business Facebook profile, change the infringing email addresses, and change his professional information on the various state bar websites. Given that much of this requested relief can be accomplished with relative ease and may be reversed after a final decision is issued from the Arbitrator, the court finds that the balance of equities weighs in plaintiff's favor.

### 4. Public Interest

Finally, plaintiff must make a clear showing that an injunction is in the public interest in this case. The Supreme Court has admonished that "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy

29

of an injunction." Winter, 555 U.S. at 24. Protecting trademark rights and preventing

trademark infringement is in the public interest. See Rebel Debutante, LLC v. Forsythe

Cosmetic Grp., Ltd., 799 F. Supp. 2d 558, 581 (M.D.N.C. 2011); Merry Maids Ltd.

P'ship v. Kamara, 33 F. Supp. 2d 443, 446 (D. Md. 1998). "The purpose of a trademark

is to protect the public from confusion about 'the identity of the enterprise from which

goods and services are purchased.'" Toolchex, Inc. v. Trainor, 634 F. Supp. 2d 586, 594

(E.D. Va. 2008) (quoting AMP Inc.v. Foy, 540 F.2d 1181, 1186–86 (4th Cir. 1976)).

"Preventing consumers from being confused serves the public interest, as does preventing

trademarks from being used deceptively, protecting the interests of trademark owners,

and enforcing valid contracts." Id. (internal citations omitted).

Based on the unique role that trademarks play in protecting society and guiding

consumers, the court find that it is in the public interest to protect the proper use of

plaintiff's mark until the Arbitrator's final decision.

## C. Relief

The court had identified the following allegedly infringing uses of

plaintiff's mark:

- Email address: georgesink@gmail.com
- Google search page title: George Sink II LawFirm
- Website: georgesinklawfirm.com
- Content on website
  - Title: George Sink II Law Firm
  - Text next to email address: George Sink Law Firm
- Facebook: George Sink II Law Firm
  - Website listed on Facebook page: georgesinklawfirm.com
- Bar websites
  - South Carolina: Georgesink@gmail.com
  - Georgia: George Sink Law Firm, georgesink@gmail.com

The court orders defendants to temporarily refrain from using the GEORGE SINK mark in an infringing manner. Specifically, the court enjoins defendants from using GEORGE SINK as a professional email address. The court enjoins defendants from using GEORGE SINK LAW FIRM as the web address for the law firm's website. The court enjoins defendants from using GEORGE SINK II LAW FIRM as the title of its website. Likewise, the court enjoins defendants from listing the name GEORGE SINK LAW FIRM on its website. This order applies to defendants' use of these marks on its Facebook page, on the bar membership websites for the South Carolina and Georgia state bars, and in any other public or online space in which these marks are being used.[4] The relief granted in this order is temporary, pending the final ruling by the Arbitrator on the matters that have been submitted by the parties to arbitration.

---

[4] At the hearing, plaintiff also argued that defendants are intentionally and improperly employing marketing techniques that, among other things, rely on certain uses of metadata to direct online search traffic away from Sink P.A. and towards George Sink Jr.'s law firm. This argument was not raised in plaintiff's motion for preliminary injunction and as such has not been briefed by the parties. At this time, the court declines to enter in what would certainly be a much more complicated and technical analysis about defendant's use of metadata in its marketing techniques when this issue was not raised in the briefings.

## IV.   CONCLUSION

For the foregoing reasons, the court **GRANTS** the motion to seal, **DENIES** defendants' motion to dismiss, and **GRANTS** plaintiff's motion for a preliminary injunction.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 9, 2019**
**Charleston, South Carolina**